WILSON et al. v. PARVIN et al.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

No. 1,105.

1. BUILDING AND LOAN ASSOCIATIONS—POWER TO ISSUE PREFERRED STOCK.

A building and loan association, in the absence of charter or other legal inhibition in the law of the state of its origin, may lawfully give one class of shares preference over another, both with respect to dividends and principal.

2. SAME—INSOLVENCY.

Under the law of Tennessee building and loan associations have, in common with other corporations, the power to borrow money and to mortgage the corporate property to secure the same. By an amendment of the law in 1893 (Shannon's Code, § 2175) such associations were authorized to issue prepaid shares bearing a fixed dividend payable out of the profits. An association, authorized thereto by a by-law, issued such shares, the principal to be payable at a fixed time, or sooner, on notice given either by the holder or the association. Such shares provided that payment of both principal and dividends should be secured by a pledge in trust of notes and mortgages payable to the association, and in ac-

cordance with such provision a trust agreement was executed, and each certificate issued bore a certificate of the trustee that the required securities had been deposited. The holders of such shares were not entitled to vote, and the proceeds were placed in the fund to be loaned to borrowing shareholders. *Held*, that the issuance of such shares was within the powers of the association, being in effect but a form of borrowing, and that the preference given was lawful, as between the holders and other shareholders, and could be enforced after the insolvency of the association to the extent of the securities pledged; there being no outside creditors.

**8. SAME—REGULARITY OF ISSUANCE—RATIFICATION.**

Such shares were not invalidated by the fact that, when some of them were issued, there was no by-law authorizing them, where such action was subsequently, ratified by the voting shareholders, and a by-law adopted authorizing their future issuance, and where no objection was made by any class of shareholders until after the insolvency of the association.

**4. SAME—INTEREST ON PREFERRED STOCK.**

Holders of paid-up stock of a building and loan association, although entitled by the contract to preference in payment of both principal and dividends, such dividends, however, to be payable only out of profits, are not entitled to interest on their shares after the association has become insolvent and ceased to make any profits.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

This is an appeal from a decree rendered by District Judge Clark settling the order in which the assets of an insolvent building loan association should be distributed among the members. The Cumberland Building Loan Association is a corporation organized in 1892 under the general law of Tennessee providing for the organization of building and loan associations. Being unable to carry on its business as contemplated and unable to meet its contracts with its stockholders, the appellees, who are citizens of states other than Tennessee, and unadvanced stockholders, filed a bill in the court below to have it wound up as an insolvent corporation. The general debts of the company, if any there were, have all been provided for, and the only questions which remain involve the rights and interests of different classes of certificate holders. The only question involved by this appeal concerns the status of a certain class of holders of certificates called "Fixed Dividend Income Stock." These certificates were in this form:

"Incorporated under the Laws of the, State of Tennessee, United States of America.

"8 Per Cent. Per Annum Fixed Dividends.

"Income Stock. $500.00.

"Payable in Gold.

"Cumberland Building Loan Association, Chattanooga, Tennessee.

"Number 1. Shares, 5.

"This certifies ——, of ——, is the owner of five shares, of the par value of one hundred dollars each, of the fully paid eight per cent. fixed dividend income stock of the Cumberland Building Loan Association of Chattanooga, Tennessee. The stock represented by this certificate is sold, and this certificate issued and accepted by the holder, upon the following express terms and conditions:

"(1) This stock is fully paid in at par and is nonassessable, the holder incurring no further liability thereon. This stock is redeemable ten years from its date at its full par value, if not sooner called or withdrawn, and is payable in gold coin of the United States of the present standard of weight and fineness.

"(2) This stock is entitled to share in the profits of the association to the extent of eight per cent. per annum, payable semiannually in cash, as per

the coupons hereto attached, upon surrender of such coupons as they severally mature. This participation in the profits is by way of preference, and is paid and accepted in lieu of all other interest in the profits of the association; the right of further participation in the profits being expressly waived.

"(3) This stock cannot be withdrawn for two years from date of issue, but after two years it is withdrawable at is full par value with accrued dividends to date of withdrawal: provided, that sixty days' notice of withdrawal shall be given to the association at its home office before payment can be required.

"(4) After five years from date of issue, the association shall have the right upon sixty days' notice to call in, redeem, or cancel this certificate, making payment therefor in cash at the par value of the stock with accrued dividends: provided, that if not so called stock shall remain in force and effect until withdrawn as herein before provided. Sixty days after such call shall have been made, the stock shall cease to participate in the profits of the association, whether this certificate has been presented for redemption and cancellation or not.

"(5) The holder of this stock shall be regarded as a depositor with the association, and, in consideration of the specific conditions upon which this stock is issued and the preferences it is accorded, any right to vote this stock or participate in stockholders' meetings is expressly waived.

"(6) Stock of this class shall not be issued at any time to an amount in excess of fifty per cent. of the live assets of this association. To secure the holder of this stock against loss of principal, mortgages and mortgage notes of the association in amount equal to double the amount of stock issued are deposited with the trustee under a trust agreement as certified hereon.

"(7) This certificate is not valid unless certified by the trustee and registered by the Central Trust Company, New York.

"(8) The stock represented by this certificate may be transferred upon the books of the association only by the holder in person, or by his attorney in fact, upon the surrender and cancellation of this certificate properly indorsed. A transfer fee of one dollar shall be charged.

"(9) The contract between this association and the holder is stated in this certificate, and agents have no authority to alter or amend such contract in any particular.

"In witness whereof the Cumberland Building Loan Association has caused this certificate to be signed by its president and secretary, with its corporate seal affixed, at Chattanooga, Tennessee, this ———— day of ————, 189–.

"————————, President.
"————————, Secretary."

Upon the back of each certificate are the following:

"Trustee's Certificate.

"This certificate of stock form one share is secured by the deposit with Wiehl, Probasco & Co. (Bank of Chattanooga) of first mortgage note receivable, and mortgages securing the same, of the Cumberland Building Loan Association, in accordance with a trust agreement dated November 1, 1893, and the holder hereof is entitled to the benefits of the trust created by said agreement.        Wiehl, Probasco & Co. (Bank of Chattanooga), Trustee,

"By H. S. Probasco."

"Register's Certificate.

"Countered and registered this, the 5th day of May, 1894.

"Central Trust Company of New York, Register,
"By ————————, Secretary."

To each certificate there were attached 20 coupons, in form as follows. Each of said coupons provides as follows:

"The Cumberland Building Loan Association promises for value received to pay bearer, on the 5th day of ————, at the office of the association in Chattanooga, Tenn., or at the Chase National Bank in the city of New York, twenty dollars, semiannual dividend on fixed dividend income stock.

"C. R. Gaskill, Treasurer.

"Certificate No. ————."

To protect the holders of these certificates according to the contract set out, there was executed on November 1, 1893, a trust agreement, under which it was provided that there should be deposited with Wiehl, Probasco & Co., a firm of bankers at Chattanooga, Tenn., as trustees, an amount of the first mortgage notes and bills receivable, executed to the association by its advanced members, in double the amount of the shares of this special stock outstanding; and it was provided, among other things, "that no stock certificate shall be certified by the trustee at any time unless it holds as depository and in trust hereunder such notes, bonds, or bills receivable in said proportion as against such stock and the certificates representing the same." This agreement also provided for additional deposits from time to time of other notes, bills, etc., as those on deposit should diminish in value by the periodical payments on the stock which had been advanced upon. The purpose of this trust was declared to be:

"(1) The deposit of said securities is to secure the repayment to the holders of the fixed dividend income stock of the Cumberland Building Loan Association of the par value of said stock, which shall be payable, if demanded by the holder, in gold coin of the United States of the present standard of weight and fineness. But said stock shall only be payable or withdrawable in accordance with the provisions of the certificate issued therefor and certified by the trustee herein.

"(2) The deposit of said securities is also to secure the preference in the payment of dividends upon said stock out of the profits of the Cumberland Building Loan Association as hereinbefore recited and as specified in the certificate issued for said stock. It is not a guaranty of the payment of dividends if the association makes or has no profits from which to pay them. It is a guaranty of the principal of the investment and of priority in the division of profits in favor of the holder of the fixed dividend income stock.

"(3) The deposit of said securities is with full power to the trustee to sell and dispose of or enforce collection of the same after thirty days' written notice to said association, in ratio of two dollars of the net value of said securities as against one dollar of the par value of said stock, in the event that said association shall make default in the payment of the par withdrawal value of said stock, or any part thereof, at its maturity ten years from its date of issue, or at any earlier period when, under the terms of the certificate issued therefor, said stock shall be tendered for withdrawal at its par value and notice given of withdrawal according to the provisions of the stock certificate aforesaid. But no sale or enforcement of the collection of such securities shall be made by the trustee under this provision until default shall have continued for six months on the part of the association, and then such sale or enforcement of securities shall only be made to protect stock upon which the payment of withdrawal value shall be actually in default. This provision shall not be construed to permit the sale or enforcement of securities in order to pay off stock which has not been withdrawn or matured, and in the payment of which no default has been made. It is for the protection of such stock as the association may make default in paying as hereinbefore stated, when same has matured or been tendered for withdrawal in accordance with its terms, and with the terms of the charter, constitution, and by-laws of the Cumberland Building Loan Association. No right shall exist to proceed in like manner to enforce the payment of dividends which may be in default, unless it appears that there are profits from which such dividends are payable, and which are not being used to pay the holders of fixed dividend income stock dividends thereon, as having priority and preference over all other classes of stockholders; the purpose of this agreement being to guaranty the payment of the principal of fixed dividend income stock, but only to secure a priority and preference in the payment of dividends thereon."

The trust agreement contains many other details not necessary to set out in reference to the management of the assets so set apart. From time to time certificates were issued under this trust agreement; the first issuing some time early in 1894, and the last in March, 1898. There were assets in the hands of Wiehl, Probasco & Co. more than enough to fully pay these unpaid certificates when this proceeding was begun. Upon a petition filed in the principal case by the receiver these assets were, by order of the court

below, taken out of the possession of the trustee aforesaid and placed in the hands of the appellant receiver, who was ordered to collect same in and hold subject to the future order of the court. Judge Clark held that the holders of these dividend certificates were entitled to be paid in preference to the other classes of stockholders, with interest from date of last dividend paid to them. From this decree the receiver and certain unadvanced stockholders have appealed.

A. W. Gaines, for appellants.

Lewis M. Coleman and W. B. Swaney, for appellees.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The question is whether the interveners, holding the very peculiar certificates called "Final Dividend Income Stock," are entitled to preference in the distribution of the assets of an insolvent building loan association, or whether they must share ratably with those members of the association who are confessedly holders of ordinary shares of stock. If the certificates represent money merely loaned to the association, money borrowed for the purpose of carrying on the legitimate business of the incorporation by advancing those shareholders holding what is known in the parlance of such clubs as "installment stock," then it is too plain for argument that the holders of such certificates are creditors, and entitled to be paid in preference to any and every class of mere stockholders.

The power "to borrow money and issue notes or bonds upon the faith of the corporate property, and also to execute a mortgage or mortgages for repayment of money thus borrowed," is every explicitly granted to all corporations organized for individual profit under the general law of Tennessee authorizing the organization of such corporations. Acts Tenn. 1875, c. 142, § 5; Shannon's Code Tenn. § 2054. The provisions of section 2054 are included in the powers of every building and loan corporation organized under the general law of Tennessee. Acts 1875, c. 142, § 14; Association v. Cowley (Tenn. Ch. App.) 52 S. W. 313; Shannon's Code, § 2180. But the power to borrow for proper corporate purposes has been implied under charters and laws not explicitly granting it. Murray v. Scott, 9 App. Cas. 519, reversing In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 440. And so is the weight of modern cases. 4 Am. & Eng. Enc. Law, 1022, and cases cited.

The constitution of the Cumberland Association provided that the by-laws might provide "for the issuance of such bonds, certificates of deposit, or other securities of the association as the board of directors may from time to time deem it advisable to issue and sell to investors, and the stockholders may by resolution confer power upon the board of directors to pledge the mortgages, bills receivable, and other securities of the association to secure such bonds, certificates of deposit, or bills payable of the association." The fifteenth by-law was in these words:

"The board of directors are authorized and empowered from time to time to cause to be issued by the president and secretary such notes, bonds, certificates of deposit, and other evidences of debt as may be necessary for

money borrowed for the use of the association or deposited with it for investment. They shall prescribe the time for which said notes, bonds, certificates, or other evidences of debt shall run, the extent to which they or any of them shall share in the profits of the association, and may fix the terms and conditions of each issue of such security. The funds derived from such sources shall be, unless borrowed for a temporary specific purpose, placed in the loan fund of the association."

By resolution of the stockholders of April 5, 1893, the directors were given authority to deposit the securities of the association to secure any loan under by-law 15. There was no by-law explicitly authorizing shares of prepaid or preference stock on November 1, 1893, the date of the trust agreement with Wiehl, Probasco & Co. But at the regular annual meeting of the voting stockholders, July 10, 1894, the action of the directors in issuing such shares and in securing same by the deed of November 1, 1893, was unanimously confirmed and ratified; the action of the stockholders being put in the form of an amendment to the by-laws. July 13, 1897, the by-laws were formally amended, so as to more distinctly authorize such shares and for securing same by pledge or deposit of the mortgage notes of the association. The issue of such shares began in January, 1894, and continued until 1898; each certificate being certified to as secured under the agreement of November 1, 1893. The certificates outstanding at one time aggregated $50,000, but when this bill was filed all had been paid off according to the contract except $22,000.

It is not at all clear that these certificates do not in substance represent loans, and not membership in the corporation. Very similar certificates have been held to constitute the holders creditors, and as such entitled to priority, at least over members. Cook v. Association, 104 Ga. 814, 30 S. E. 911; Building Co. v. Silverberg, 108 Ga. 281, 33 S. E. 908; Burt v. Rattle, 31 Ohio St. 116; Dickinson v. Trust Co. (Sup.) 52 N. Y. Supp. 672; Munhall v. Boedecker, 44 Ill. App. 131. But it is not necessary to decide whether the holders of these special certificates are entitled to priority as creditors, because it is very clear that, if they are not creditors, it is because they are preferred stockholders,—preferred both as to dividends, if there were profits applicable to dividends, and principal, to the extent that the assets set apart for that purpose will satisfy their claims.

But the appellants, the receiver and certain unadvanced stockholders, say that the association had no power to issue preferred shares, or to secure same, as against the ordinary shareholders, and that the certificates are valid only as ordinary, unpreferred, prepaid shares, being entitled to no priority either as creditors or preference shareholders. Did the association exceed its powers in issuing preferred prepaid shares and in securing them by a pledge of its assets? The question is to be answered apart from any question as to the effect of such a preference upon general creditors. There are no general creditors. The question here is whether the preference accorded this class of stock is valid as against other members of the corporation who have assented to or acquiesced in its issue?

Much has been said about the issuance of preferred shares being "violative of the principle of equality and mutuality," which, it is said, is the distinctive thing characterizing such associations. That pre-

ferred shares do disturb the "equality" of interests which ordinarily prevails between shareholders may be conceded. That business corporations may generally, in the absence of charter or other legal inhibition in the law of the state of their origin, prefer one class of shares over another in respect to profits and principal, is now well settled. Cook, Stocks & S. § 268 et seq.; Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 664, 36 L. R. A. 826; Warren v. King, 108 U. S. 389, 2 Sup. Ct. 789, 27 L. Ed. 769; Miller v. Ratterman, 47 Ohio St. 141, 24 N. E. 496; Murray v. Scott, 9 App. Cas. 523, affirming In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 453, upon this point. There is no prohibition of such shares in the charter of this association or in the general law of Tennessee. If, then, the issuance of preferred shares with the consent of the members of a building and loan association is an act ultra vires, it must be because it is an act offensive to the object, plan, and general scheme of such corporations, and therefore not within the implied powers of this kind of an association. It is said, in some of the cases which deal with the scheme of such associations, that such shares are inconsistent with the mutuality of such organizations by introducing the mere investor as a factor, and that the loans made by such companies to installment members would be usurious, but for the supposed mutual contribution of all to the fund thus loaned and the equal participation of all, including the borrowing members, in the contributions arising from interest, premium, dues, and fines. It is also said that the scheme of such association only contemplates the payment of. members in advance out of the fund resulting from the small periodical payments from all the shareholders alike, and that there is in fact no lending or borrowing, but that the notes taken and the mortgage given by an advanced member are only to secure the periodical payments due from him until his stock is matured and his note and mortgage thereby canceled. This was doubtless the original theory of the Tennessee incorporating act of 1875, for one provision of that act, now found as section 2132, Shannon's Code, was that "the monthly call for payment of said installments shall not exceed two dollars on each and every share." This provision would seem to preclude prepaid shares, and by inference preferred shares. But this general law was amended by chapter 12, § 1, Acts 1893, being now section 2175, Shannon's Code. This amendment authorizes in express terms the issuance of "installment stock, to be paid for in periodical sums, and prepaid and paid-up stock, upon which a gross sum shall be paid in advance in cash, as may be prescribed by the by-laws; and cash dividends may be paid on the stock authorized to be issued, out of the net earnings, as the by-laws may prescribe, provided such dividends shall not exceed the per cent. of profits earned."

In order to "advance members" there must be a fund out of which they may be advanced. The slow accumulations from subscribers paying only two dollars per share each month was doubtless found unsatisfactory to those it was intended to assist in the acquisition of homes by the aid of such companies. This amendment was accepted by this association April 5, 1893, and on November 1, 1893, the directors authorized the issuance of the shares in question and the

execution of the mortgage of that date. The first certificate, as heretofore stated, was issued June 4, 1894, and from time to time other certificates were issued, the last some time in 1898; the deposit of mortgage notes being increased from time to time, so that at all times there has been a pledge of assets to protect these special certificates according to the terms of the contract. The necessary operation of this amendment was to authorize two wholly distinct classes of stock, the installment shares and the fixed dividend shares. The first would naturally be sought by those expecting to borrow, while the other class would be inviting only to those seeking an investment. The object in permitting these investment shares was plainly to assist those members of such associations who needed loans or advance to aid in procuring homes by inducing contributions from a special class of members, who might be tempted by the promise of receiving as a dividend a larger return upon their money than otherwise admissible. So far, then, as these are prepaid shares, contracting for cash dividends payable out of the net earnings of the association and not otherwise sharing in the profits, they are clearly authorized by the amended charter.

But it is said that the amendment does not authorize any preference, except one out of the profits for the payment of the preferential dividend, and that the agreement to redeem or cancel these shares in preference to others out of assets set apart for that purpose is beyond the scope of the power. To admit that the charter as thus amended does not expressly authorize a preference in respect to the principal of such shares does not advance the argument. To issue preference shares is within the implied authority of every corporation, unless prohibited by some positive provision or repugnant to the general object and purposes of the organization. Now, if the organic law of this association has been so amended as to invite a class of shareholders solely for the purpose of enlarging the fund accessible to the installment or borrowing members, we are wholly unable to see how it can be said that associations having not only the express power to borrow money for corporate purposes, and to secure same by mortgage, but the power to issue prepaid shares bearing a fixed dividend payable out of the profits, may not prefer such shares both in principal and dividends. There is no public policy against it, and the preference is neither unjust nor immoral. It is, after all, but a form of borrowing; the lender receiving a limited dividend in place of interest and having no further interest in the association.

Building and loan associations are peculiar corporations. In none other is it admissible that the capital shall be withdrawn at the will of the stockholder. But in these it is expressly provided that any stockholder may withdraw, on giving 30 days' notice thereof, and receive "the amount paid in and such proportion of the profits as may have accumulated." The only limitation upon the privilege found in the charter is that but one-half of the funds in the treasury is subject to such demands without the consent of the directors. This withdrawal privilege, it has been held by some courts, is suspended upon insolvency, and all paid alike, whether notice has been given before insolvency or not. Latimer v. Investment Co. (C. C.) 81 Fed. 776; 4 Am. & Eng. Enc. Law, 1051; Post v. Association, 97 Tenn. 408,

37 S. W. 216, 34 L. R. A. 201. But these decisions rest upon the interpretation of the by-laws, constituting the contract in respect to withdrawals; it being held that the right exists as a contractual right only while the corporation is a going concern. The certificates in question limit this right of withdrawal, as the holder in effect waives the right and agrees not to exercise it for two years, unless the profits of the association shall fail to pay him a dividend for a period of six months. In view of the fact that the subscriber to such fixed dividend stock is in substance and effect a lender, his membership being a nominal thing, having no right to participate in the management and no interest in the profits beyond the amount he has contracted to receive, we see no inconsistency in an agreement preferring him in the assets set apart to secure to him his money on withdrawal or at the maturity of the transaction as fixed by the contract. There are no creditors to deal with. The transaction here involves only the validity of an agreement as between the shareholders, and we express no opinion in respect to the validity of the trust arrangement to protect these certificate holders as against general creditors.

We have not been referred to any decisions by the Tennessee courts which involve the power of associations organized under the laws of Tennessee to issue shares preferred as to dividends and principal. Province v. Association, 104 Tenn. 458, 58 S. W. 265, involved only the power of such associations to contract to mature shares within a definite time. The holding there was that any contract by which "it should undertake to give one of its members a greater share of profits than another, or to relieve him preferentially from the full discharge of his obligation to the association by payment of a part, would be in violation of this principle of mutuality." The certificates here involved present no such contract. In Post v. Association, 97 Tenn. 408, 37 S. W. 216, 34 L. R. A. 201, it was held that dues paid in advance, upon ordinary installment shares, under an agreement that interest should be allowed upon such advance, did not constitute the stockholder, in a case of insolvency, a creditor to the extent of such advance. After referring to the provision forbidding the requirement of a greater monthly payment than two dollars on each share, Judge Wilkes, in speaking of the arrangement by which payments of dues might be made in advance and interest allowed thereon, said:

"It was, in some respects, the same thing as if the association, in order to accommodate its borrowers, had gone to some bank or outside person and borrowed money to put into the association. Such a proceeding is not warranted by the charter, or the proper scope and scheme, of a building and loan association. They should not be borrowers of money, but only lenders, for the proper purposes of their creation. To allow the amounts advanced to be paid back would be to sanction such proceedings as legitimate loans, to convert capital into loans, and to create preferred stock, in order to work out supposed equities. We think the proper holding upon this matter is to treat the advances as payments upon stock, and not as loans to the company; and this is, in effect, carrying out the intention of the parties, which was to pay up their stock in advance, and, by anticipation of its maturity, receiving a discount by so doing."

The conclusion that such payments should be regarded as advance payments on stock, "and not as loans to the company," was the ground upon which the decision was put, and a proper interpretation

of the transaction. The observations of the learned judge, as to the want of power in such companies to borrow or to issue prepaid stock were dictum, and wholly overlook the express power to borrow conferred by section 5 of the act of 1875, as well as the power under the act of 1893 to issue prepaid stock bearing a fixed dividend out of profits. It is more than probable that this transaction occurred before the amendment of 1893, or that the association had not accepted that amendment; otherwise, these provisions would have been considered. At most, the case is no authority for the contention that an agreement giving a preference to authorized and valid prepaid stock over the ordinary shares is invalid as between the members of the company.

The power to borrow for the purpose of lending to members was recognized as one which existed within limits by the Tennessee court of chancery appeals in Association v. Cowley, 52 S. W. 313. In re Guardian Permanent Ben. Bldg. Soc., 23 Ch. Div. 440, is a well-reasoned case, and is directly in point. In that case a by-law was held valid which gave directors power to issue paid-up shares with the right to withdraw in preference to the ordinary unadvanced members. The case on this point was affirmed in Murray v. Scott, 9 App. Cas. 519. In Murray v. Scott, just cited, the power to borrow money to enlarge the lending fund, and to secure such loans by a preference over all shareholders and members, was recognized as a valid power by implication, and held to be a legitimate method of carrying out the ends and objects of the association; no such power having been either granted or prohibited.

In conclusion, we hold that the power exercised in issuing prepaid shares, preferred as to dividend and principal, is a valid exercise of the powers of the corporation inter se, and not so inconsistent with the purposes and objects of such an association as to be regarded at this late day as a void and illegal thing.

A question has been made against the validity of these shares as preferred shares, because, when some of the shares were issued, there was no by-law authorizing such action by the board of directors. This was cured by the subsequent confirmation of what had been done, both in respect to shares already issued and in the execution of the trust agreement of November 1, 1893, to secure such preferred shares as should from time to time be issued. This curative action was given the aspect of an amendment to the by-law, and operated both retrospectively and prospectively. Aside from this affirmative action of the stockholders, there is abundant evidence in the reports of the officers, the action of subsequent stockholders' meetings in sanctioning the payment of dividends on such shares, and in the literature of the association, that the action of the directors in this matter was notorious. There was no objection or protest until the insolvency of the association was evident.

Until January, 1898, the only shares which had the right to vote were shares called "common stock." At that time the right of voting was, at a meeting in which every class of stock participated, extended to stockholders of every class, including these fixed dividend stockholders. We had occasion lately to determine the effect of this extension of the right of management upon the contracts with the "common

stock" which had reserved to itself the exclusive power of voting. Synnott v. Association (C. C. A.) 117 Fed. 379. It is now urged that the stockholders who prior to 1898 had no right to vote should not be precluded by any action taken by the small class of common stockholders who could. This objection comes too late. If the objectors were members when the common stock authorized or ratified the issuance of such shares, they were bound by the action of the common stock, which under the by-laws of the society could alone vote. The nonvoting stock was all subscribed with that provision in force, and, if it was void, it was incumbent upon disfranchised stockholders to act promptly in giving effect to their dissent to any exercise of a power which could be validly exercised if authorized by the members. The case is even less plausible in respect to those who became members only after this kind of stock has been resolved upon and the trust deed of November 1, 1893, executed. The association's assets have been increased, to the extent of the par of every share of this preferred stock, in reliance upon the validity of the contract evidenced by the shares themselves and the trust deed under which they were issued. The corporation had the power to make the contract it did make. Irregularities in the exercise of the power may be waived by acquiescence or by a want of diligence in objecting. This record is full of evidence of assent, confirmation, and acquiescence upon the part of the stockholders of every class to the sale of these shares.

The decree gave to these certificates interest after payment of last dividend. This is error. The contract did not require the payment of interest. The dividend was not payable at all events but only out of profits. This is the plain meaning of the contract. Lockhart v. Van Alstyne, 31 Mich. 76, 18 Am. Rep. 156; Warren v. King, 108 U. S. 389, 2 Sup. Ct. 789, 27 L. Ed. 769; Cook, Corp. § 271; Taft v. Railroad Co., 8 R. I. 310, 5 Am. Rep. 575. When the association became insolvent, it ceased to have any profits out of which to pay dividends. The decree will be modified, so as to give a preference to the principal, without interest. If the assets were sufficient to repay the entire capital, and leave a surplus, a different question would arise; for such surplus would be profit.

The decree is in all other respects affirmed.