ELLA WINEGARDNER, Appellee, v. EQUITABLE LOAN COM-
    PANY, JOHN W. WINEGARDNER, AND KNOXVILLE NATIONAL
    BANK, Defendants, AND O. D. KESTER, Cross Petitioner,
    Defendant.

Building and Loan Association: ISSUANCE OF GUARANTEED STOCK:
1   POWER OF ASSOCIATION. Where a building and loan association
    issues its stock on an agreement that it will mature in a spec-
    ified time, and guarantees that if there is not then sufficient
    money to its credit the deficiency will be paid out of its guar-
    anty fund, consisting of money derived from the sale of other
    stock and from stock payments, the same constitutes a prefer-
    ential contract not within the power of a building and loan
    association, and a company entering into it is not entitled to
    the benefit of the statutes relating to such associations.

Estoppel. The fact that a holder of preferred stock of a building
2   and loan association, on which she obtained a loan, has made
    repayments to the amount of such loan will not estop her
    from asserting the invalidity of the contract.

Preferred Stock: LEGALIZING ACT. Chapter 48 of the Acts of the
3   27th General Assembly legalizing the system of premiums,
    fees and fines exacted by building and loan asociations has no
    application to the issuance of preferred stock.

*Appeal from Marion District Court.*—HON. A. W. WILKIN-
SON, Judge.

TUESDAY, MAY 19, 1903.

ACTION in equity to cancel a mortgage made by plain-
tiff to the Equitable Loan Company, and assigned to O.
D. Kester. Decree as prayed, and Kester appeals.—
*Affirmed.*

*G. K. Hart* and *McNett & Tisdale* for appellant.

*W. S. Bilby* and *Crozier & McCormick* for appellee.

WEAVER, J.—Under the date of April 1, 1895, plaintiff
subscribed for three shares, of $500 each, in the Equitable
Loan Company, a corporation organized in this state, and
received a certificate reciting, among other things, that in
consideration of a sum of $6 per month to be paid until
the maturity of the shares, estimated to require only one
hundred and eight months, the company would pay the
holder $1,500 on surrender of the stock. To this promise
was added the following: "Provided, however it is ex-
pressly agreed between this company and said stock-
holder, that when these shares are one hundred and
twenty months old and one hundred and twenty payments
of six dollars each have been made thereon, these shares
shall be matured and if at that time the money to the
credit of these shares does not amount to $1,500.00 the
deficit shall be paid out of the guarantee fund, or any
money belonging to the guarantee stock issued by this
company." On the same date plaintiff received from said
defendant $1,500, the repayment of which she secured in
the following manner: (1) by a note as follows: "$1,606.50.

Ottumwa, Iowa, April 1, 1895. For value received we promise to pay to the order of the Equitable Loan Company of Ottumwa, Iowa, at its treasurer's office in Ottumwa, Iowa, sixteen hundred and six and fifty one hundredths dollars as follows: The sum of thirteen and fifty one hundredths dollars on the fifth day of each and every month for the full period of one hundred and nineteen months commencing April 5, 1895. Said monthly payments consisting of the following items: Six and no hundredths dollars monthly dues on capital stock of said company evidenced by certificate No. 683 this day pledged by me to said company to secure this loan and seven and fifty one hundredths dollars the same being monthly interest due on loan, and further agree in case of default in monthly payments of said sums of money or any part thereof at the times and according to the terms of this obligation to pay fines and penalties assessed against us by the said company on the account thereof in accordance with its by-laws and rules or any of the by-laws and rules that may hereafter be passed or established, and in case of default, if the stock pledged, the security given to secure said sums of money and said monthly payments, shall upon the foreclosure and sale thereof be insufficient to pay said company in full, we promise and agree to fully pay and discharge the same. Ella Winegardner." (2) By another note, for $892.50; being, as therein stated, the sum of $7.50 per month for the full period of one hundred and nineteen months for premium bid for the right of precedence in receiving the loan. (3) By another note, for $1,500, payable six years after date, with six per cent. interest, payable semi-annually. (4) By a "mortgage deed" of certain real estate, securing the payment of the $1,500 note above mentioned. And (5) by a mortgage on the same property, securing the other two notes above described, and reciting that it is made subordinate to the $1,500 lien.

Prior to May, 1900, plaintiff had paid upon the contract evidenced by the foregoing obligations the aggregate amount of about $1,275, and, desiring to make payment in full, tendered the company the sum of $502.50, as the unpaid balance; and, the tender being refused, this action was begun. In addition to the foregoing, she alleges that the contract of loan was usurious, that there was in fact no bidding for precedence in obtaining the loan, but said so-called premium was arbitrarily fixed and inserted in the contract as a pretext to conceal the real character of the transaction. She further asserts that the shares of capital stock issued to her were of a class known as "A" stock, which by its terms gives preference to its holders over the holders of other stock, and by reason of such preference they are void and worthless, and afford no consideration for the obligations given by her. She further alleges that in May, 1900, the company failed in business, went into liquidation, and failed and refused to carry out its contract. The answer of the Equitable Loan Company admits the loan and the making of the several instruments already described, and admits that the stock issued to the plaintiff provided for preference over the holders of other stock. It alleges that after giving plaintiff due credit for all her payments, and value of her stock, there is still due a balance of $1,258.57, for which amount it asks a foreclosure of its mortgage. Thereafter the appellant filed a pleading alleging that the Equitable Loan Company had gone into liquidation, and that in winding up its affairs he became the purchaser, and is now the owner of the notes and mortgage in suit. He adopts the allegations and claims made herein by the company, and alleges that plaintiff, by accepting the certificate of stock and making payments thereon, is estopped to deny its validity. Other matters are pleaded by the parties, but the foregoing embodies all that is essential upon this appeal.

There is no controversy but that the stock issued to plaintiff, by which full payment was guarantied at a fixed time, was part of a limited class which was issued in the earlier history of the company; but, this plan of business having been disapproved by the executive council, the practice was later abandoned. It is also conceded or conclusively shown that plaintiff has paid upon the various installments required of her, pursuant to the several obligations given the company, the sum of $1,260, and a membership fee of $15, and that she has since made the tender of $502.50, as pleaded. There is no claim that there was any competitive bidding in awarding the loan to the plaintiff, but a subsequent legalizing act by the legislature is relied upon to avoid any plea of usury based on such omission.

I. The appellant's claim of right to enforce a performance of plaintiff's contract according to its terms rests upon the proposition that the transaction is within the protection of the statute relating to building and loan associations. To be entitled to this protection, it must appear that the corporation was an association of that character, and that the contract which it seeks to enforce is of a kind which it was authorized to make. As an alleged building and loan corporation, it is claiming to exercise rights and privileges which are denied to corporations and individuals generally; and, to obtain judicial recognition of these exemptions or exceptions from the general rule, it must bring itself and its contract within the terms and conditions which are precedent to the exercise of the exceptional privilege. For the present, we will assume that the Equitable Loan Company was in its lifetime a building and loan association. It is unnecessary for us here to go into any dissertation upon the general scope and nature of these enterprises. It is sufficient for present purposes to say that the fundamental idea upon which the whole struc-

*I. ISSUANCE of guaranteed stock: power of association.*

ture has been erected is that of mutual profit sharing by all members, whether borrowers or nonborrowers. Such an organization has and can have no "capital," in the ordinary sense of that word, except the contributions made from time to time by its shareholders; thus constituting a fund to be loaned or advanced to members desiring the same, and presenting the requisite security. No share of stock in such association can be worth more at any time than the sum of the installments which have been paid thereon increased by its proportionate part of the profits earned. In other words, no share can ever be legitimately "matured" until the aggregate of such payments and earnings is equal to its par value. When that time comes, the stock is retired by operation of law, and the holder ceases to be a member, and becomes a creditor of the corporation, for the face value of his certificate. In the very nature of things, it is impossible for the corporation, its officers or agents, to know in advance the precise date when stock may be matured; and if an issue is made upon an agreement to pay or redeem it at par at a date certain, and the earnings prove insufficient to make good the contract, one of two results must follow: The corporation must confess its insolvency, or by some scheme or device cast the loss upon the remaining holders of its stock; thereby reducing their profits and postponing the maturity of their own shares. A transaction which leads to such results is certainly not within the spirit or intent of the law which authorizes the existence of these associations.

We come, then, to the inquiry whether the transaction between plaintiff and the Equitable Loan Company is open to the objections here considered. By the terms of the certificate, it is first agreed that at maturity, estimated to require only one hundred and eight months, the corporation will pay the certificate holder the full sum of $1,500. It then provides that one hundred and twenty months shall be the extreme limit of the time for maturity, and,

if at such date the "credits" upon the stock are insufficient for payment in full, the deficit is to be made up from the guaranty fund.     That this agreement gives, or attempts to give, the holder of the stock thus issued "a preference over the holders of other stock in the company," is very clear, and is expressly admitted in the pleadings.   It is true, as contended by appellant, that at the date of this contract there was no provision in our statutes expressly forbidding or expressly authorizing the issuance of stock with a "guaranty" or definite payment feature.     Indeed, at that time the necessity and propriety of strict and definite statutory regulation of this business had not appealed to the legislature, and the provisions then existing for that purpose were exceedingly meager and indefinite. But building and loan enterprises had for many years been carried on in this and other states, and their status, character, and limitations were already reasonably well settled by the courts.  In the absence of express statutory regulations, we think a corporation organized to do a building and loan business would therefore be restricted and controlled by the principles and rules which have obtained general judicial approval.     The question presented in this case is not to be disposed of by reference to the law which permits ordinary corporations to issue "preferred stock."  While both classes of corporations may be organized under the same general chapter of the Code, the nature of their business, the powers conferred, and the ends to be attained are so radically different that argument by analogy is apt to be misleading.  Preferred stock, generally speaking, is an issue of shares upon which a stated dividend from the corporate profits is to be paid before any distribution is made to the holders of common stock.   If there be no profits, there is no dividend to either class.  If the profits be small, the preferred stock may absorb them all; but, if great, the preferred stock receives no more than the stipulated dividend, and the common stock may prove the more profitable.   This

plan, which is entirely compatible with an ordinary business undertaking, is essentially destructive of that "mutuality, reciprocity, and equality" which is so often declared to be the controlling idea of the building and loan business.

But the scheme of a "guaranty fund" adopted in the present instance is based on no plan for the distribution of profits. As disclosed by the evidence, that fund was created by setting apart a definite portion of each and every installment paid by members upon their stock subscriptions. It was further supposed to be strengthened by holding in reserve the entire proceeds of the sale of another class of stock, known as "guaranty stock," to be applied to the same purpose if necessary. It is manifest that such a fund represents no profits whatever, but is in fact a part of the principal invested by the shareholders generally; and the process of thus "maturing" shares does not differ in principle from one by which, when the agreed date of maturing a guarantied share arrives, and the profits are insufficient to pay in full, the deficit is assessed or levied upon the entire membership. By this scheme, even though there were not a dollar of profit earned (a result which recent history shows is by no means impossible), yet the preferred holder of a guarantied share at the end of one hundred and twenty months would withdraw his entire investment of $240, with an "unearned increment" of $260, taken directly from the pockets of his fellow members. Surely the legislature could not have believed or understood that business of this kind was included within the powers granted to building and loan associations, and if, in the stress of competition for business, an association assumes to enter into a contract so foreign to the idea which the law is intended to promote, sound public policy forbids that it be allowed to claim therefor the peculiar privileges and immunities which have been granted for the protection and encouragement of business within the legitimate scope of their

organization. . It is no answer to these objections to
say. ⁓s is suggested by counsel, that, while the company's
pro. ᵢᵤₑ was to pay at a date certain out of a particular
fund, there was "no undertaking that this fund would be
sufficient to make good the deficit." Possibly that answer
would be pertinent and sufficient if the stock had been
matured by one hundred and twenty payments, and this
was an action to recover the face value thereof from the
corporation upon its promise, but that is aside from the
question before us. In *Sumrall v. Columbia F. & T. Co.,*
20 Ky. 1801 (44 L. R. A. 596, 50 S. W. Rep. 69), the plan
of the association was very similar to the one, we are now
considering. The association becoming insolvent, the
holders of the guarantied stock sought to be given prefer-
ence in the distribution of the assets. The relief was
denied; the court, among other things, saying: "When
we bear in mind that the corporation we are dealing with
is a building and loan association, with certain underlying
principles of co-operation, equality, and mutuality in its
make-up, not common to ordinary corporations, and which
may be termed the common law of its existence, the ob-
jection to upholding preferential contracts among mem-
bers becomes apparent. All such attempts are absolutely
void, as contrary to the natural law of such associations."
Dealing with the same question, the Supreme Court of
Illinois says: "The plan of issuing stock containing such
agreements is entirely foreign to the purposes of the cor-
poration contemplated by the statute, and we cannot but
regard them as of no force or effect." *King v. Interna-
tional, etc,* 170 Ill. 135 (48 N. E. Rep. 677). Many other
authorities of like nature could be cited, but the principle
announced seems so reasonable and so consonant with
well-recognized requirements of public policy, which hold
these and other corporations to fair observance of the lim-
itations by which their power to contract is bounded, that
further quotation is not called for.

II.   The plea of estoppel is not well founded.   The fact that plaintiff made numerous payments upon the stock induced no act or change of condition on the part of the company, nor has it been prejudiced by her delay.   She was morally, if not legally, bound, in any event, to return the money she had received.   That duty she has performed, and she is entitled to a discharge of the mortgage liens, unless we find the contract is to be enforced according to its terms, under the building and loan statute, which, as we have said, cannot be done.

*2.  ESTOPPEL.*

III.   The legalizing act (chapter 48, page 32, Laws 27th General Assembly), has no application here.   That act provides, in effect, that section 1898 of the Code of 1897 shall apply to outstanding contracts of building and loan associations.   This legalizes, as we have already repeatedly held, the system of premiums, fees, and fines which are recognized by said section 1898, and by the use of which high rates of interest were exacted; but there is no provision in the Code of 1897, or in the act of the Twenty-Seventh General Assembly, which directly or by implication gives validity to an issuance of preferred stock, or to discrimination between shareholders.

*3.  PREFERRED stock: legalizing act.*

IV.   While we hold the mortgages and notes unenforceable as a building and loan contract, under our statutes, it is not necessary for us to consider whether any such general invalidity inheres in the contract that it may not be enforced as an ordinary loan.   Plaintiff has chosen to treat the claim against her as enforceable to that extent, and has made a sufficient tender on the basis of such computation.   This, we think, is the extent of the rights of the assignee of the company, and the decree of the district court is therefore AFFIRMED.