W. R. HOGSETT *et al.* v. THE ÆTNA BUILDING &
LOAN ASSOCIATION *et al.*

No. 15,501.    (96 Pac. 52.)

SYLLABUS BY THE COURT.

1. BUILDING AND LOAN ASSOCIATIONS—*Preferred Stock—Distri-
bution of Funds.* Where preferential stock issued in a build-
ing and loan association organized under the General Statutes
of 1889 (ch. 23) is authorized by the agreement of the
members expressed in the by-laws and recited in the certifi-
cates issued therefor, the preference so agreed upon will be
observed in the distribution of funds among the different
classes of stockholders when not immoral or contrary to public
policy.

2. ———— *Agreement by Stockholders Guaranteeing Redemption
of Preferred Stock.* In the absence of statutory inhibition, no
fraud or mistake being claimed, the agreement of one class of
stockholders in such an association that the amounts con-
tributed by them monthly in payment for stock shall be held
in a guaranty fund pledged for the redemption and payment
at a certain time of the stock of another class, at a fixed
amount, will be enforced, and such guaranty fund will be so
applied when it becomes necessary to do so in order to effect
the redemption of the shares so guaranteed.

Error from Shawnee district court; ALSTON W.
DANA, judge.    Opinion filed May 9, 1908.    Affirmed.
Opinion denying a petition for a rehearing filed May
19, 1908.    Judgment modified.

STATEMENT.

THE Ætna National Loan Company was incorporated
in 1891, under section 1426 of the General Statutes of
1889, for the purpose of accumulating and loaning
funds, the erection of buildings and the purchase and
sale of real estate for the mutual benefit of its mem-
bers.    With the exception of a change in name and in
the amount of capital stock it continued to do business
on the original plan until the year 1899, when it was
reorganized under the law then in force.    Under its
original charter and by-laws it issued two kinds of

stock, called, respectively, series stock and guaranty stock, in the proportion of $900,000 of the former to $100,000 of the latter. The stock was so issued in four series, numbered 1, 2, 3, and 4, of the par value of $1,000,000 in each series, in shares of $500 each, viz., 1800 shares of series stock and 200 shares of guaranty stock in each series. The certificates of series stock contained the provision that the holder should pay $2 each month upon each share, and that when he had thus made 120 monthly payments his stock should be deemed matured, and if at that time the money to the credit of such share did not amount to $500 the deficit should be paid out of the guaranty fund. The certificates of guaranty stock provided for monthly payments of $2 each until the money to the credit of each share should be equal to the par value thereof. They also contained the following:

"All money paid on said shares, and all accumulated profits thereon, shall remain pledged to issue number —— of series stock of this company, as provided in the by-laws, and can not be withdrawn until all of said issue number —— of series stock of nine hundred thousand dollars ($900,000), issued by this company, has either been forfeited, retired, withdrawn or matured and redeemed, as provided in the by-laws of this company."

These recitals in the certificates were authorized by the by-laws. The by-laws also provided that series stock might be withdrawn at any time, the holders to receive the amount credited to their shares, together with dividends credited thereon, less fines, if any; that the guaranty fund could not be withdrawn, but should be held as a reserve to defray expenses, provide against losses and guarantee the maturity and redemption of series stock; that redemption of guaranty stock should not be made or dividends paid thereon until all shares of series stock of the same issue were retired or redeemed. The by-laws required two funds to be kept: the guaranty fund to include all payments on guaranty

stock, examiner's, attorney's and membership fees, interest and premiums from ·that fund, rents received, and twenty-five per cent. of the dues paid in by series stockholders; all other moneys were to be credited to the loan fund, and belong to the series stock, and when the series stock in any series should be retired or redeemed the guaranty stock should be redeemed at its book value. Profits were apportioned every six months to each fund, in proportion to the amount of such fund.

The plan, then, is this: The guaranty fund is pledged to make up to the series stockholders the maturity value of their shares, whether the association earns that amount or not, so that every holder of series stock who has made 120 payments of $2 each shall receive $500. If the amount to the credit of such shares is insufficient, it is to be made up out of the guaranty fund, to that extent diminishing the value and postponing the maturity of the guaranty stock. The association thus agreed to pay $500 per share on the series stock at the end of ten years after its issue, if not sooner forfeited or withdrawn. To this the holders of guaranty stock agreed, if the recitals in their certificates and the provisions of the by-laws are held to express their agreement.

The accounts of the guaranty fund were not kept by the association as provided in the by-laws, but that fund was divided into two parts, viz., "guaranty stock," including only the monthly payments received as dues on guaranty stock, and "guaranty fund," embracing the other items of the fund so named in the by-laws.

Before the maturity of the series stock of issue No. 1 all of that stock had been withdrawn, except· 195 shares, which were matured and paid in full on or about March 1, 1903, and this left $309.40 to the credit of each share of guaranty stock in that series, which shares were then redeemed, the owners receiving that amount on each share. The series stock was chiefly paid out of the loan fund, but that fund was not quite

sufficient, and the deficit was made up from the guaranty fund. Before the 30th of June, 1906, 797 shares of series stock in issue No. 2 were matured and paid at $500 per share, all other stock in that issue having been previously retired. In making such payments the amount of the loan fund was applied, but, not being sufficient, the balance was paid out of the guaranty fund, and this included a sum greater than that belonging to that issue. Thereupon the company claimed, and now claims, the right to reimburse the guaranty fund for the withdrawal of such excess by transferring a like amount thereto from the fund designated as "guaranty stock"; that is to say, the company claims the right to appropriate out of the sums paid in by the guaranty stockholders on account of their stock an amount equal to the excess so withdrawn from the guaranty fund to make up the deficiency on the series stock. If such appropriation is made it will exhaust the entire fund called "guaranty stock," except $2.23 per share. There are now outstanding 179 shares of this guaranty stock in issue No. 2, upon which the company has received $240 per share, amounting to $42,960. If this plan is carried out each holder who has paid in $240 will receive but $2.23.

There are now outstanding 142½ shares of guaranty stock in issue No. 3, upon which $210 per share has been paid, and 152 shares of guaranty stock in issue No. 4, upon which $184.21 per share has been paid. The series stockholders are still continuing their monthly payments, but the guaranty stockholders ceased to pay upon the bringing of this action, the association having consented to a suspension of payments for six months. If this plan of distribution of the assets is continued, as provided in the by-laws, literally construed, all the funds denominated "guaranty fund" and "guaranty stock" will be exhausted in maturing the series stock outstanding, except sufficient to pay $2.23 per share, as stated, on issue No. 2 of guaranty

stock, and there will probably be a small per cent. remaining to return to guaranty stockholders in issues numbered 3 and 4. There are sufficient funds on hand, however, to meet all the obligations upon stock issued prior to the reorganization, and to pay back all moneys actually paid in by all stockholders in both classes, with some profit to each, if the distribution could be made equally. The amounts that may be appropriated to pay holders of stock of both classes in issues numbered 1, 2, 3 and 4 can be readily determined, and the distribution of the fund can be made as may be ordered, the business after the reorganization having been done upon a different basis.

Upon these facts the plaintiffs, holders of guaranty stock, instituted this suit and asked that these funds be distributed *pro rata* among all stockholders of both classes, returning to each the amount paid in on his share and a proportionate share of net profits. The defendant association and the series stockholders, on the other hand, contended that distribution should be made as the by-laws provide, and as the officers were about to do, redeeming the series stock in full and paying to the guaranty stockholders whatever may be left. Judgment was rendered for the defendants, and the plaintiffs prosecute error.

*Clinton J. Evans*, and *Charles D. Welch*, for plaintiffs in error.

*R. J. Brock*, *W. S. McClintock*, *A. B. Quinton*, and *E. S. Quinton*, for defendants in error.

The opinion of the court was delivered by

BENSON, J.: A corporation is clothed with the powers given by its charter. (*A. T. & S. F. Rld. Co. v. Fletcher*, 35 Kan. 236, 10 Pac. 596.) The issuance of preferred stock, in the absence of statutory prohibition, violates no rule of public policy. (1 Cook, Stock & Stock., 3d ed., § 268.) It is urged, however, that such

preference can only be in earnings, and can never be made up out of capital. It is conceded that there may be a preference in the distributioh of capital when such distribution is proper, but that capital can not be applied to the payment of profits or dividends in any event. That this is the rule with reference to preferred stock in ordinary corporations must be admitted.

"An agreement to pay dividends absolutely and at all events—from the profits when there are any, and from the capital when there are not—is an undertaking which is contrary to law, and is void." (1 Cook, Stock & Stock., 3d ed., § 271.)

This rule is referred to with apparent approval in the second edition of Endlich on Building Associations, section 464, as applicable to such corporations. The contention is that the preference, as claimed by defendants, is contrary to the spirit and purposes of such an association, preventing the execution of the scheme for which it is organized, which scheme and purpose must be considered as limiting the effect of the language of the by-laws. It is said that the intention of the legislature in providing for this class of corporations circumscribes the extent of their lawful powers, although such restrictions are not expressly named in the statute. It has been held, however, that such an association, in the absence of charter or other legal inhibition, may lawfully give one class of shares preference over another, both with respect to dividends and principal, and that prepaid shares, bearing a fixed dividend to be paid at a definite time in pursuance to the by-laws, may be issued; that the preference thereby given is lawful, and, as between the holders of such stock and other shareholders, will be enforced in the distribution of assets. (*Wilson v. Parvin,* 56 C. C. A. 268, 119 Fed. 652.) In *In re Guardian Permanent Benefit Building Society,* 23 L. R. Ch. Div. (Eng.) 440, in discussing the rights of preferred shareholders on the winding up of a building association, it was said:

"There is nothing in the statute which says that you

may not contract to give some shares an advantage over others for value received. But then there is this further consideration which must be discussed. Is it contrary to the nature of these societies, so that it is impossible to make a society with this kind of shares consistent with the law and conduct of the society? On that point I do not think it is the province of the judicature to find out things to be inconsistent with the ordinary requirements of mankind, which the people themselves have not found out. It is all very easy for people to say it is against policy, or against the meaning of these societies; but when you see that people who have established the society do not think so, and have acted on a contrary view, it is very improbable that it is contrary to the nature of the society, and contrary to the objects the members have in view." (Page 464.)

In *Vought v. Eastern Bldg. & Loan Assn.*, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. Rep. 761, a case where the holder of preferential stock sued for the maturity value of $100 per share, after having paid in seventy-eight payments of one dollar each, the court said:

"At the threshold of this investigation we find an absolute and unqualified promise upon the part of the defendant to pay to each of the holders of the stock owned by the plaintiff the sum of one hundred dollars for each share at the end of seventy-eight months from the date of the certificate, and also an indorsement thereon of the actual time when the shares were to mature. Therefore, as that time had expired and the required payments had been made, it is manifest that the plaintiff was entitled to recover, unless there is some other part of the contract which modifies or changes that provision." (Page 512.)

The court then reviewed the by-laws and articles of association and held that the agreement expressed in the certificate of stock was not modified, and added:

"Can any one suppose for a moment that the plaintiff or her assignor, when she or he purchased this stock, with an agreement that it should mature at the end of seventy-eight months, even suspected that such maturity was to depend upon other conditions or circumstances than the expiration of the time? Obviously not.

This contract must be interpreted as an agreement upon the part of the defendant to pay to the plaintiff and her assignor the amount of one hundred dollars upon each of the shares represented by the two certificates in suit at the expiration of seventy-eight months from their date and at the time indorsed upon the back thereof." (Page 516.)

It was contended in that case that the statute did not authorize such preference. On this point the court said:

"We deem it unnecessary at this time to determine whether the defendant was authorized by that statute to enter into such contracts, for if we assume that the making of them was in excess of the express power conferred upon the corporation by that statute, still, as the contracts involved no moral turpitude and did not offend any express statute, they were not illegal in a sense that would prevent the maintenance of an action thereon. It is now well settled that a corporation can not avail itself of the defense of *ultra vires* when the contract has been, in good faith, fully performed by the other party, and the corporation has had the benefit of the performance and of the contract." (Page 517.)

In *Leahy v. The National Building & Loan Association,* 100 Wis. 555, 76 N. W. 625, 69 Am. St. Rep. 945, it appeared that certain shares, called "definite contract stock," had been issued, upon which a certain sum was to be paid at maturity. Referring to the claim of the contesting stockholders that this issue was unauthorized, it was held that when they became members and assented to the contract in that form they became foreclosed from contesting it.

The office of by-laws is to regulate the conduct and define the duties of the members toward the corporation and among themselves. (Thomp. Bldg. Assoc., 2d ed., § 41.) The by-laws constitute the contract between the members which determines their rights, provided they do not violate the statute or public policy. (Thomp. Bldg. Assoc., 2d ed., § 51.) The by-laws of this association, as also the certificates of stock in both classes, plainly stated the preference, and postponed the re-

Hogsett v. Loan Association.

demption of guaranty stock until all series stock should
be redeemed at $500 per share. It was the hope and ex-
pectation that, with the high rate of interest then al-
lowed and the withdrawals that were anticipated, there
would be ample funds to redeem the remaining shares
of series stock at maturity without resorting - to the
guaranty fund; and this hope, it seems, was realized
upon the first issue, leaving a fair profit to the holders
of guaranty stock then matured and paid. Because the
holders of series stock of later issues did not withdraw
so large a proportion, and because profits were dimin-
ished by the reduction of the legal rate of interest, in-
vestors in guaranty stock were disappointed in the re-
sult, and found that instead of receiving back the
amounts paid in, with a profit, they would receive but
little, if anything. It must be supposed that when they
guaranteed full payment to the series stockholders out
of the guaranty fund, into which their monthly pay-
ments were to go, they believed that as the owners of
the residue of the assets after the series stock should be
retired they would be the gainers. With the plan before
them, unfolded in the by-laws, they chose to invest in
this guaranty stock upon the conditions stated in the by-
laws and in the certificates. Their hopes, except as to
the first issue, have not been realized. Without claiming
any fraud or deception, they now ask that the by-laws
be so interpreted in connection with the plan and pur-
poses of such association as to allow them to share *pro
rata* with the holders of the series stock. It is difficult
to see how this can be done without impairing the right
of contract or doing violence to the agreement upon the
faith of which the investments were made in series
stock.

Decisions have been cited to the effect that the issu-
ance of such preferential stock in such associations is
unlawful, as being in violation of certain underlying
principles of coöperation, equality and mutuality which
are not common to ordinary corporations, and which
have been termed the common law of their existence

(*Sumrall, &c., v. Commercial Building Trust's Assignee, &c.,* 106 Ky. 260, 50 S. W. 69, 44 L. R. A. 659, 90 Am. St. Rep. 223; *Winegardner v. Equitable Loan Co.,* 120 Iowa, 485, 94 N. W. 1110) ; but in the circumstances of this case, where the only question arises upon the relative rights of these two classes of stockholders under the by-laws and the recitals in the certificates, we believe the true rule to be as stated in section 149 of Thornton and Blackledge on Building and Loan Associations :

" 'Shares conferring on their holders preferential or additional rights not enjoyed by the holders of other shares are called preference shares or preferred shares. They can only be created when the authority to create them is given by statute or charter, or by agreement between all parties interested.' Unless there be some law authorizing it, the power to issue preferred stock rests upon universal consent on the part of all stockholders ; but this universal consent may be contained in the articles of association providing for the issuance of such shares, adopted when the association was formed."

As all the parties interested agreed to the preference claimed by the series stockholders, and the guaranty stockholders pledged their stock payments to make up the necessary amounts to redeem such series stock, it is not perceived how they can be relieved from their undertaking. This association differs essentially from ordinary corporations. It has no capital except such as it receives in monthly instalments from its members, and the earnings thereon ; consequently its engagement to pay a definite amount to shareholders must, if the net earnings are insufficient for that purpose, be kept, if kept at all, by resorting to the fund so paid in. In the absence of any statutory inhibition, no fraud or mistake being claimed, the agreement of one class of shareholders in a building and loan association that the amounts contributed by them in payment for stock shall be held in a guaranty fund pledged for the redemption and payment at a certain time of the stock of another class, at a fixed amount, will be enforced, and

Hogsett v. Loan Association.

such guaranty fund will be applied according to the agreement when it becomes necessary to do so in order to effect the redemption of the shares so guaranteed.

The district court having rendered a decision in harmony with these views, the judgment is affirmed.

SMITH, GRAVES, JJ., not sitting.

---

OPINION DENYING A PETITION FOR A REHEARING.

The opinion of the court was delivered by

BENSON, J.: In the petition for a rehearing a forceful presentation is again made of the claim of the plaintiffs for a *pro rata* distribution of the funds over which this controversy has been waged. We must, however, adhere to the view expressed in the opinion that the rights of the parties are determined by their contract, as set out in the by-laws and the certificates.

Our attention, however, is now more directly drawn to the fact that the plaintiffs' action was not only to obtain a ruling upon the manner of distribution, but also to have such distribution made under the direction of the court. The judgment of the district court appears to have made no provision for such distribution. Having taken jurisdiction of the subject-matter, the court should retain it until complete equity is done, and this all parties now request. To this end the court should ascertain the present condition and amount of the fund available for that purpose and proceed to the distribution thereof in accordance with the judgment. It is difficult to determine with exactness from the agreed statement whether this fund will be sufficient to pay the series stockholders in the classes entitled thereto in full, and it is now shown by the stipulation of the parties filed in this court that the fund is not sufficient for that purpose. This is an additional reason why the court should proceed in its distribution, giving to each

6—78 KAN.

his proper share thereof. The district court has ample power to do this, and to take possession of the fund for such purpose and appoint a receiver if necessary. The judgment is modified in accordance with these views.