66   75
19ap164

66h   75
f162a454

66h   75
53ad250

66h        75
1 37 Mis²680

# WILLIAM H. BEERS, PLAINTIFF, *v.* THE NEW YORK LIFE INSURANCE COMPANY, DEFENDANT.

*Corporations — compensation of an officer of, for past services — ultra vires contract — 'a president presiding but not voting at a meeting at which he was voted an unearned future salary for life.*

The New York Life Insurance Company, a corporation having no capital stock (its assets being held in trust for the benefit of the policyholders, who, by statute, were made the members of the corporation), exercised its corporate powers by a board of twenty trustees, the term of office of five of whom expired annually. The charter provided that the president and vice-president should be elected annually, which the by-laws reaffirmed and added that the president should have general supervision and direction of the company, and that the actuary should also be elected annually; that the supervisory and agency committee should have power to appoint and remove all agents, and to fix their compensation, and that the president and vice-president should have such power over all other persons employed; that no alteration of the same could be made unless it had been proposed at a stated meeting, and was adopted by a majority of the trustees at a subsequent meeting.

In 1891 the superintendent of the insurance department of the State of New York investigated the affairs of the company and reported that large losses had arisen from neglect and incompetency in the management, but he did not find that Beers, the president, who had been connected with the company for many years, or the trustees, had been guilty, personally, of corrupt acts.

At a meeting of the trustees, held February 8, 1892, Beers presided, but presented his resignation, to take effect February 10, 1892, which was then accepted. At the same time the trustees, by resolution, authorized the corporation to enter into a contract, by which Beers was to be paid during life $37,500, in recognition of past services and of his future usefulness to the company. Such a contract was subsequently entered into between Beers and the company, by which Beers agreed, during his life, "so far as strength and health permitted," to serve the company in an advisory capacity, to use his best efforts for its success, and not to enter any other company or any business which might compete with that of the New York Life Insurance Company.

This contract recited his past services and his resignation, and a resolution which had been passed relative to the subject on January 25, 1892, spoke of making a proper recognition of services rendered. After this contract was made Beers was not asked to, nor did he, render any services to the company, which refused to make the first payment falling due under the contract.

Upon a submission of the question as to Beers' right to enforce this contract:

*Held,* that Beers was not entitled to recover.

That it was evident that the contract was based upon past services, and was, therefore, void.

That the charter and by-laws showed that it was not intended that the trustees of the corporation should have power to make contracts which might extend far beyond their term of office, and that they could not make this contract with Beers for his life.

That it was intended, by the short terms of office of the officers, and the manner prescribed of employing agents, that the corporation should maintain a present control over its servants.

That, under the by-laws, which had not been amended as required at a stated meeting, the trustees had no power to appoint any person to office under the corporation.

That Beers, who had been president of the corporation for years, must be presumed to have known of the limitations in this regard fixed by its by-laws.

That the contract was void, as against public policy, because Beers presided over the meeting which legislated in his favor, although he did not vote upon the resolution granting him the salary.

That while the tendency of late decisions is to allow a trustee or director to contract with his corporation, provided that, while acting in his own interest, he does not also act as trustee or director, yet this rule does not apply where one actually presides over a body and superintends a balloting, by the result of which he profits individually.

SUBMISSION of a controversy between William H. Beers, as plaintiff, and the New York Life Insurance Company, as defendant, without action upon an agreed statement of facts, under sections 1279–1281 of the Code of Civil Procedure.

*Esek Cowen* and *Frederic R. Coudert*, for the plaintiff.

*A. Hamilton*, for the defendant.

VAN BRUNT, P. J.:

The question in difference is stated in the agreed case to be:

"Is the said Beers entitled to be paid and to recover from and have judgment against the said the New York Life Insurance Company, in the sum of $9,375, being the first quarterly payment upon and under an agreement hereinafter set forth executed by the said William H. Beers on his own behalf, and by A. H. Welsh, second vice-president, and R. W. Weeks, actuary of the said The New York Life Insurance Company, on behalf and under the seal of and by authority of the board of trustees of said company on February 8th, 1892?"

The power of the court to decide this question arises from sections 1279 to 1281 of the Code of Civil Procedure, which provides

that parties to a question in difference, which may be the subject of action, may agree upon a case containing a statement of facts upon which the controversy depends, which case must be accompanied by the affidavit of one of the parties to the effect that the *controversy* is real.

If the position attempted to be taken by the learned counsel for the plaintiff is correct, then there is no controversy whatever to be submitted to the court; because it is claimed by him that the board of trustees of the defendant have not repudiated the contract; and that their act agreeing to the submission expressly states that their resolutions authorizing the president to obtain a submission from a court of competent jurisdiction as to the validity of the contract are not to be understood as an affirmance or disaffirmance of said contract. Now, unless there has been a denial, and is a denial, upon the part of this defendant corporation, of any liability upon this contract, then there is no controversy. This court is not the advisory counsel of this corporation. It does not occupy any such position; and it does not propose to act in any such capacity; and if it is the purpose of the trustees of this corporation to use this court for that purpose, the court must decline the office.

But, as we understand the position of the corporation, it is a denial of liability upon the contract; and a denial of liability upon the contract is necessarily a repudiation of the same. The fiscal officers of the corporation have refused to pay, and the trustees have not dissented from that refusal. The refusal to pay is based upon the claim that the corporation is not bound by this contract, and the trustees have not dissented from this position. Hence the controversy. And understanding that this corporation, both by its fiscal officers and its trustees, has denied its liability upon this contract, and, therefore, repudiate the same, this court proposes to discuss the *controversy* which has thus arisen.

The facts bearing upon the submission are substantially as follows:

By a curious metamorphosis, the Nautilus Insurance Company, incorporated in 1841, for the purpose of exercising the power of an insurance company for marine inland navigation, was, by various statutes passed in and prior to 1849, changed into a purely mutual life insurance company called the New York Life Insurance Company. It has neither stock nor stockholders. Its assets belong to,

and are held in trust for the exclusive benefit of policyholders, who, under one of the statutes authorizing the transformation, constitute the members of this corporation. All the corporate powers of the company were to be exercised by a board of trustees, and such officers and agents as they might appoint, the board of trustees consisting of twenty persons who should elect a president and vice-president annually, who should, on their election, be *ex-officio* members of said board of trustees, and hold office until others were elected in their stead. The term of office of a trustee was four years; and but five of their terms expired annually, which would require at least three years to elapse before the policyholders could choose a majority of new trustees after any given period or event. By the by-laws, it is provided that the president shall have the general supervision and direction of the business of the company. The plaintiff, up to and for a number of years prior to the 10th of February, 1892, had been a member of the board of trustees and the president of the company, and had the general control and management of its affairs. In 1891 the management of the company was severely assailed as injudicious and extravagant, which led to an official examination of its affairs by the superintendent of the insurance department of this State, and which resulted in an official report, showing large losses in the management of the affairs of this company, arising from gross neglect and incompetency in its management; but which fortunately had not, as yet, resulted in insolvency.

There was no finding in the report of the department of any personal dishonesty upon the part of Beers, and nothing which showed any corrupt or dishonest use of the profits of the company *for the private gain of any of the officers of the corporation.* It is stated in the agreed case that the plaintiff denied the charges of mismanagement, wrote an elaborate defense thereof, and expressed to the board of trustees not only his willingness, but strong desire to have the matter of the propriety of his dealings with agents, and in making investments, made the subject of a judicial determination, and that he was sustained in his position by a large majority of the trustees of the company.

What this last clause in the submission means we have not been able precisely to determine. If it was his position of willingness

and strong desire to be further investigated, this large majority of the trustees seem to have limited themselves to approving the desire, without taking any action to give such desire effect.

Upon this report of the insurance department, on the 25th of January, 1892, at a meeting of the board of trustees, over which the plaintiff presided (eighteen members being present, and there being one vacancy), a committee of the board of trustees was appointed and directed to take into consideration such report and consider what action should be taken in view thereof; the submission stating that Beers did not vote. As the resolution was seemingly carried without any difficulty without his vote, of course, there was no necessity of his putting himself upon record in favor thereof. This committee reported to the full board at an adjourned meeting on February 8, 1892 (nineteen members being present), over which meeting Mr. Beers presided throughout, which he seems to have done whenever his personal interests were at stake. In their report the committee stated that they had given the matter most careful consideration in order to determine what course was best for the interests of the company, and what changes in the organization or methods of the company were desirable; and they recommended the division of duties of executive officers by the appointment of an auditor who should report direct to the trustees, the amendment of certain parts of the by-laws, and that a contract which had already been submitted to the committee to pay the plaintiff $25,000 per annum for life in recognition of past services and his future usefulness to the company be entered into. At the same time there was tendered at the meeting, by Mr. Beers, his resignation of his office as president, to take effect on Wednesday, February 10, 1892; but he did not resign his office of trustee, which continued until April, 1892. At this meeting the board accepted the resignation of Beers, and, after passing a eulogy upon his administration of the affairs of this corporation, notwithstanding the fact that large losses had arisen from gross neglect and incompetency in its management, authorized an agreement to be made with him to secure his services during the remainder of his life in an advisory capacity upon half pay, viz., an annual salary of $37,500, thus raising the recommendation of the committee by fifty per cent, and authorizing the second vice-president and the actuary to execute the contract submitted under the

seal of the company    Thereupon, upon the same day, an agreement was entered into between the plaintiff and the defendant, whereby the plaintiff agreed, *so far as strength and health permitted*, to serve the company in an advisory capacity, and give its officers all the aid and assistance that might lie within his power in said advisory capacity to maintain and extend its business prosperity, and at all times to use his best efforts for the success and benefit of the company ; that he would not become an officer, or enter the employment of any other life insurance company or association or become connected in any form with any other company, or enter into any business directly or indirectly which should affect or be in competition with the defendant during the remainder of his life.    The defendant thereupon agreed, on the true and faithful performance of the covenants and agreements therein contained on behalf of the plaintiff to be kept and performed, to pay the plaintiff during the remainder of his life the annual salary of $37,500 payable quarterly, to commence on the 10th of February, 1892.    The plaintiff continued to act as president up to and including the 10th of February, 1892, and presiding over the meeting on that day, and, as already stated, he continued to hold his office, as trustee, until April, 1892.    On the 12th of February, 1892, the vacancy in the office of president was filled, and since that time plaintiff has ceased to act as president, and he has not rendered any services or given any assistance or advice to the company, and has not been called upon to do so.    The first payment under the agreement having become due the plaintiff demanded the same, which the president and fiscal officers of the company refused to make, claiming that the company was not bound by the agreement, and, therefore, the trustees authorized the president to execute the submission of the controversy between the parties to this court, and the question is whether, upon this state of facts, the plaintiff is entitled to recover the sum of $37,500 a year during the continuance of his life from the defendant, being one-half of the enormous salary which he received for managing or mismanaging the affairs of this corporation.

It seems to us that there can be but one answer to this proposition. It is urged upon the part of the plaintiff that the contract in question is not *ultra vires*, but clearly within the chartered powers of the corporation ; that the plaintiff had resigned when the contract

was executed, and there is nothing in the case to show that his resignation was any part of the consideration of the contract; and that, although this contract has been assailed as a pension to the plaintiff for past services, there is no such consideration stated in the contract, nor is there anything in the submission which justifies any such conclusion.

It seems to us that a very brief examination of the facts admitted in the submission justifies the criticisms which have been suggested. The committee appointed at the meeting of the 25th of January, 1892, recommended that, "in view of the long and devoted services rendered by Mr. William H. Beers to this company, his untiring energy and ability shown in building up a company which is second to none, we feel that *a proper recognition of such services* and his future usefulness to the company, warrant us in suggesting to this board that a salary of $25,000 per annum be given him to continue for life in accordance with a contract already submitted to this committee." This language clearly shows that, in the opinion of this committee, the $75,000 salary which the president had been receiving did not sufficiently compensate him for the faithful services which he had rendered, and they, therefore, recommended this additional compensation, by way of a pension, of $25,000 per annum to continue during his life. And this idea permeates the recitals of the contract itself. It says: "Whereas, the party of the second part has been connected with this company since 1858 (about 34 years), and has occupied successfully the positions of accountant, cashier, actuary, vice-president and president, and has been largely instrumental in building up this company to its present high position and financial strength. And, whereas, he has resigned the office of president of this company to take effect the 10th day of February, 1892. And, whereas, it is deemed desirable, in the interests of this company, that the company should retain the benefit of his knowledge, skill and experience. Now, it is hereby mutually covenanted and agreed as follows:" That is, that, in consideration of the premises — of the fact of his building up the company to its present high position and financial strength — the fact that he had lost his salary as president by his resignation, and the other fact that it was deemed desirable, in the interests of the company, that the company should retain the benefit of his

knowledge, skill and experience.   And he obligated himself to serve the company in an advisory capacity so far *as strength and health permitted*, and not to enter the employment of another life insurance company.   This report was acted upon favorably when presented to the board of trustees at their meeting, so far as it related to the contract with Mr. Beers, except that they were of the opinion that a pension of $25,000 was not sufficient for Mr. Beers' future compensation, and its amount was raised to $37,500, one-half of his salary as president.   As to this increase the members of the special committee were recorded as voting in the negative.

It seems to us apparent from this state of facts that the true consideration for the payment of this large annuity was that this board of trustees desired to give the plaintiff some recognition out of the pockets of the policyholders of the past services which they seemed to think had been so valuable to the company and inadequately compensated.   The idea of past services is the one which permeates the resolutions and the agreement.   It is studiously referred to, apparently to fortify the action of the trustees, because they seemed to realize that the payment of such an enormous salary in order that a man should sit with his arms folded and render no services whatever to the company could not otherwise be justified.   That services to the company were not contemplated is apparent from the very nature of the agreement, because it is for life, and is not even dependent upon the ability to render any service to the company, because the obligation to serve is only " so far as strength and health might permit."   And as it seems to be conceded that the corporation would have no right to make any such agreement founded upon past services, the claim of the plaintiff would necessarily fall because of that infirmity in his contract.

There is another ground which seems to be fatal to the obligatory force of the contract in question, and that is that this board of trustees has no power to make a perpetual contract.   If they can employ a man to do nothing in a so-called advisory capacity as long as he shall live, there is no reason why they could not employ every clerk, accountant, messenger boy or other employee for the same length of time, and thus take the management of the business of the corporation out of the hands of the owners of its assets, viz., the policyholders, with whom the policy of the law supposes the ultimate

authority lies. The policy of the law under which this corporation is organized is, that every four years its board of trustees may be wholly changed ; that five of its members may be compelled to retire at the end of any one year at the wish of the policyholders ; and that by this means the policyholders shall have the ultimate control of the manner in which the business of the company shall be conducted, and determine who shall be the agents, employees and servants of the corporation. Of this right the board of trustees cannot deprive the policyholders by making contracts which will extend for long periods of years beyond their terms of office. This principle was recognized in reference to the relations between railroad corporations when it became necessary for the legislature to expressly authorize the leasing for a long term of years of one corporation to another. And even notwithstanding this legislation it was until very recently the settled policy of this State that such power could not be authorized by the board of directors of a railroad company without the assent of the stockholders.

But our court of last resort has recently established the doctrine that the board of directors of a railroad company, elected by the stockholders to manage its affairs for a year, may, without the consent of the stockholders, lease all the property confided to their management for a year, for an unlimited period and thus forever deprive the stockholders of any further control over their property.

The right to exercise this extraordinary power was held to exist in this corporation, solely because of the legislation which permitted one railroad corporation to lease its property to another.

The principle of continued control over the officers and employees of this corporation is recognized in its charter and by-laws. By this charter it is provided that a president and vice-president shall be elected annually, and by the by-laws it is provided that a president, vice-president and actuary shall be elected at the next regular monthly meeting of the board after the annual election for trustees. Its resident physicians were to be appointed by the board, to hold their office during the pleasure of the board. The supervisory and agency committee had the appointment and removal of agents and the fixing of their compensation ; and the president and vice-president had the power to appoint, remove and fix the compensa-

tion of each and every person, except agents, employed by the company, and were required every three months to make a written report to the supervisory committee in respect to all changes made relating thereto.

Under this condition of affairs it is evidently not within the powers which were committed to the board of trustees by the policy-holders, that they should be able to fasten upon such corporation a subordinate so long as he might live.

From this construction of the charter and by-laws, in connection with the provision contained in such by-laws that no alteration of the same might be made without first being proposed at a stated meeting, and that such alterations could be considered only at a subsequent stated meeting, and adopted only by the concurrence of a majority of the whole board, it would seem that by their own act, the board of trustees were precluded from making any such contract. The by-laws are explicit as to by whom all agents and servants shall be employed. The supervisory and agency committee, as already stated, had the power to appoint and remove agents and fix their compensaion. And the president and vice-president had the power to appoint every other employee, but were required every three months to make a written report to the supervisory committee in relation to all changes made relating thereto.

It may be said that the board of trustees who adopted these by-laws might change the same. But they have expressly provided how these by-laws shall be changed, viz.: That any change should be first proposed at a stated meeting, considered at a subsequent stated meeting, and adopted only by concurrence of a majority of the whole board. If this provision means anything; if these by-laws mean anything; if they have any force and effect for any purposes whatever, the board of trustees could not make any alteration in these by-laws except in the manner therein provided.

We do not think that it will be seriously contended in our day, that the regulations of business, as embodied in by-laws, are only binding so long as a majority of the board of trustees may see fit, notwithstanding the provisions as to the manner in which alterations therein shall be made. Therefore, this action upon the part of the board of trustees in attempting to employ this plaintiff in any capacity was wholly without authority, and absolutely nugatory.

The plaintiff, as president, must be presumed to have known of these restrictions. He had been so long connected with the corporation, and had so long exercised the duties of president, that he cannot be held to have been ignorant of this important function pertaining to his office.

It is further urged against the validity of this contract that the plaintiff, being the president of the defendant and a member of its board of trustees, could not enter into a contract of this description for his own benefit, by virtue of resolutions passed at a time when he was present in the meeting of the board, and presiding over its deliberations. Until a comparatively recent period in the history of jurisprudence in this State, it was considered the law that no director or trustee of a corporation could contract with the corporation without raising the presumption that such contract was fraudulent.

It may be true that Mr. Morawetz, in his Work on Corporations (§ 527), after stating that it had been held in some cases that a director cannot enter into a valid contract with the corporation of which he is an agent, although the corporation is represented in the transaction by a majority of the board of trustees, says : " But the weight of authority and of reason appears to indicate that such a contract would be valid."

It is unfortunately true that, at the present time, the weight of authority is that such a contract may be valid ; but the weight of reason is absolutely the other way. And a very brief consideration of the relation of a director or trustee of a corporation to it, seems to show that public policy ought to be so shaped that such opportunities for flagrant frauds should not be allowed. The director or trustee is appointed by the owners of the property of the corporation for the purpose of the management of the business of the corporation ; and their term is always restricted ordinarily to one year, but in some cases, in order that there may not be an abrupt change in the whole policy of the corporation, only certain portions of the board are elected at each annual election. These directors or trustees are appointed by the owners of the property, because of their confidence in their ability, integrity and business capacity, and because they believe that they will devote this ability, integrity and business capacity to the furtherance of the

interests of the corporation. The director or trustee, when he takes upon himself the duties of the office to which he has been elected by the owners of the property of the corporation, is by them understood to obligate himself to exercise, in the management of the business of the corporation, all the ability, integrity and business capacity of which he is possessed; and that upon each and every occasion he shall protect the rights and interests of his constituents. Now, it is apparent that the owners of the property of the corporation, having conferred upon a person the office of director or trustee for the purposes above mentioned, and the director or trustee having undertaken the obligations of such office, it is a flagrant dereliction of duty for him to deprive the corporation of the benefit of those counsels which he has promised to give the corporation in every contingency by proposing to enter into a contract for his own benefit. If one director can enter into a contract for his own benefit, then every director can, and instead of the interests of the corporation being studied by the board of trustees, the individual or private interests of each trustee or director would become the main objects of their efforts and enterprise.

The director has no right to deprive the corporation of the benefit of his counsels by his own act, because his advice upon any question of administration, if conscientiously given, although he may originally have stood alone, may change the minds of all his brother directors. And, therefore, it ought to be no answer to the objection to a director entering into a contract with the corporation, that his vote was not necessary to the carrying out of the contract, and that he took no part in the meeting of his associates which authorized the same.

But, unfortunately, the rule in this State has been relaxed; and in the cases of *Van Cott* v. *Van Brunt* ( 82 N. Y., 535) and *Gamble* v. *Queens County Water Company* (123 id., 91) it is held that a director is at liberty to make a contract with his corporation so long as he does not, while acting in his own interest on the one side, also act on the other in the capacity of trustee, so that his interest and his duty might conflict. It is difficult to see how his interest and duty do not conflict when, because of his interest, he does not perform his duty as director or trustee. But we have to take the law in this respect as we find it. And how does that apply to the case at bar?

The plaintiff, at the time these very resolutions were passed, at the time this contract was authorized, did not feel sufficiently confident as to the action of his board of trustees to allow some other officer to preside over their deliberations at these meetings, wherein his interests were so deeply involved ; but he felt it necessary, in order that this scheme should be carried out, that he should control the course of deliberation ; that he should put the question as to the execution of this contract with himself ; that he should superintend the vote upon such resolution, and that he should announce the result.    He, therefore, took this part at least in the conduct of these meetings and saw to it, that his own interests were duly advanced at the expense of the corporation whose welfare he was supposed to represent.

This question might have been a different one had he deemed himself sufficiently strong to have absented himself from these meetings.    But instead of that he seems to have thought it necessary to keep his board of trustees under his own eye, in order that they should do his behests in respect to this contract, and at each meeting he presides throughout, conducts the deliberations as to this pension of $37,500 given to him, and now claims that such a contract is a valid contract because he did not vote.    If a contract of this kind is to be recognized and upheld in a court of justice, then the courts may as well take the remaining step, and say that unless a board of trustees can be proven to have acted from a corrupt and fraudulent motive in the making of a contract with one of its own number, such contract shall be upheld even though the contracting trustee takes part in the deliberations of the board, which results in the authorization of the contract, and as a trustee urges and votes for its adoption.

It is further urged, as an objection to this contract, that the plaintiff agreed that he would not become an officer of or enter into the employment of any other life insurance company or association, or become connected in any form with any other company, or enter into or become engaged in any business, directly or indirectly, which should affect or be in competition with the defendant for the remainder of his life, and that this is in restraint of trade and void as against public policy, unless it is shown to be reasonable and necessary, and the case failing to show that the plaintiff cannot recover.

In the disposition of this case it has not been considered necessary to discuss this proposition. It has seemed to us advisable to place our decision upon the other points which are so strongly presented by the facts admitted in the case at bar, and they seeming to indicate that no recovery upon the part of the plaintiff can be had upon the contract in question, judgment should be ordered for the defendant, with costs.

O'BRIEN and LAWRENCE, JJ., concurred.

Judgment ordered for the defendant, with costs.