ANDREW M. ROLLINS, Appellant, *v.* CO-OPERATIVE BUILDING BANK, Respondent.

*Contract between a building and loan association and its superintendent by which the percentage paid as compensation to the latter was continued after he ceased to be superintendent — when enforcible — when not affected by a change of by-laws.*

The articles of association of a building and loan association provided for an expense fund which should consist of the membership fee of one dollar which each member was required to pay on each share of stock subscribed, together with an amount equal to one per cent each year upon the par value of all the stock issued by the corporation.

In 1891, soon after the corporation started in business, it appointed a superintendent to represent it in fifteen counties of the State of New York. The contract between the corporation and the superintendent provided that the latter should have the exclusive right to appoint and employ agents in his district and that he would "in person and through agents energetically solicit and procure memberships for the bank in the district assigned to him and devote his whole business time to such work," and that he would "supervise and be responsible for all such business done in his territory and from time to time * * * visit and give his personal attention to the branches and agents in his district."

The contract also provided: "the Superintendent is to receive for his services an amount equal to 100 per centum of each and every membership fee coming in from his district, through him or agents. He may, however, retain 100 per centum of the membership fee on account, for himself or for advances to agents, provided the receipt hereof is acknowledged to him by the Bank, either directly or by countersigning as agents receipt as already specified, and the amounts so receipted for shall be charged to his account.

"In order to maintain the business under his charge as long as he remains such Superintendent he shall receive from the 'Expense Fund' of the Bank an amount equal to 20 per centum of amounts actually received by the Bank for the Expense Fund arising from the memberships allowed to him. If, for any reason, he ceases to be such Superintendent, he, his executors, administrators and assigns shall receive an amount equal to 15 per centum of the Expense Fund, received thereafter from business actually procured by or through him, unless his official connection with the Bank be terminated on account of dishonesty or fraud, * * * If, however, he is discharged by the Bank for any other cause than neglect of the business, dishonesty or fraud, the Bank shall pay him the full 20 per centum of the expense fund as if he were actually employed."

The superintendent was required from the amount received by him to pay the expenses and compensation of the agents appointed by him, and also all rent and every other expense in the conduct of the business in his district.

The contract also provided: "This appointment is to continue for a period of ten years from date hereof, and for such time thereafter as the parties hereto may agree; but either party may terminate it at pleasure, at any time by giv-

ing the other party ten days' written notice personally or by mail. After such notice is given the Superintendent shall, at once and on demand turn over his business and all property of the Bank to a properly accredited representative of the Bank. The death of the Superintendent shall immediately terminate this appointment."

A supplementary contract executed on the same day provided that the superintendent should receive, in addition to the amounts stated in the original contract, fifteen per cent of the amount credited to the expense fund from dues collected on memberships procured prior to the date of his appointment in the district allotted to him.

March 2, 1894, the parties made a further contract by which it was agreed that, on and after October 1, 1893, the plaintiff should be paid thirty-two and one-half per cent of the expense fund received by the bank for business obtained in the district after March 1, 1893. This contract provided that out of said thirty-two and one-half per cent said superintendent should pay certain percentages that had theretofore been agreed to be paid by the corporation to other persons within the district. It also provided that the superintendent should receive seventeen and one-half per cent from the expense fund received by the corporation on certain business obtained in a prescribed part of the district prior to the time therein mentioned.

February 10, 1899, up to which time the contracts had been faithfully performed by both parties, the superintendent left the employ of the corporation. On that day by mutual agreement the superintendent surrendered and assigned to the corporation his said contracts with it, and in consideration of one dollar and of the surrender and assignment of the said contracts the corporation agreed and bound itself, its successors and assigns, " to pay to the said party of the first part the 20 per cent of the amounts hereafter collected by said party of the second part for the Expense Fund of said Bank, arising from the stock now in force, or from all of said stock continuing in force during the period of four years from the date hereof, in the district covered by said contract and supplement, dated September 24, 1891, and to pay a proportionate part of the same to said party of the first part in weekly payments for the term of four (4) years from the date hereof, and no longer, and to make quarterly settlements with said party of the first part of any unpaid balance of said 20 per cent as aforesaid."

The corporation performed the last-mentioned contract until January, 1901, when it refused to make further payments thereunder, it having in January, 1900, without the superintendent's knowledge or consent, changed its by-laws by abolishing the "Expense Fund" and making other provision for the payment of the expenses of the corporation.

*Held,* upon a consideration of all the circumstances attending the execution thereof, that none of the contracts made between the corporation and the superintendent was void either because it was unreasonable, *ultra vires* or without consideration;

That the change in the corporation's by laws did not render the contracts unenforcible, but that said contracts should be enforced in view of the articles of association and by-laws in force at the time the contracts were severally made.

APPEAL by the plaintiff, Andrew M. Rollins, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Saratoga on the 19th day of April, 1904, upon the decision of the court, rendered after a trial at the Saratoga Trial Term, a jury having been waived, dismissing the complaint upon the merits.

*Jeremiah K. Long* and *Thomas S. Fagan,* for the appellant.

*George E. Waldo,* for the respondent.

CHASE, J. :

The defendant is a domestic corporation organized under chapter 122 of the Laws of 1851, entitled " An act for the incorporation of building, mutual loan and accumulating fund associations," and the acts amendatory thereof and supplemental thereto. Its articles of association provide that any person approved by the president or secretary may become a member by signing the articles of association or agreeing in writing to abide by the same and subscribing for one or more shares of stock and paying one dollar per share membership fee. Certificates of stock are issued to the subscribers and thereafter they are required to pay twelve cents per share per week in advance, until the amount standing to the credit of the stock, including the semi-annual dividends to be paid by the corporation and credited to the stockholders, amounts to one hundred dollars, the par value of the stock, when the same can be withdrawn. Under the articles of association the company is also authorized to issue special certificates for what is called " prepaid stock." Prepaid stock is sold for fifty dollars per share in addition to the membership fee and such premium as the board of directors may require to be paid therefor. When the earnings apportioned to the prepaid stock, less a dividend of six per cent, payable semi-annually on the fifty dollars to the owner thereof, amount with the fifty dollars to one hundred dollars, the par value of the stock, then such par value can be withdrawn by the holders thereof.

In 1891 the defendant had just started its business. It had no capital or deposits and it was necessary for it to pay the expenses of the corporation from its receipts from stockholders. The articles of association provide for an expense fund and it is also provided

that such expense fund shall consist of the one dollar membership fee paid in on each share of stock subscribed, together with an amount equal to one per cent each year upon the par value of all stock issued by the company. There are also certain fines provided for non-payment of dues, and certain fees for withdrawals and for transfers of stock, which fines and fees are to be paid into and become a part of the expense fund. It is also provided "that no compensation be paid to any officer, agent, attorney or employee of the bank except out of any surplus in the Expense Fund which may remain after the payment of all other expenses." To obtain any considerable number of subscriptions for stock it was necessary for the corporation to employ solicitors. Under the articles of association the expenses of the corporation and the accumulated funds to be loaned to stockholders are to be obtained principally from a large number of small weekly payments. The proposed plan could not be successfully carried out without the assistance of energetic agents and solicitors under the control of honest and efficient superintendents. The articles of association provide that the board of directors of the corporation shall "employ assistants for the transaction of the business ; fix the compensation of all officers, agents or employees." Plaintiff, who seems to have been a competent man for a superintendent, in 1891 resided in an adjoining State. On the 24th day of September, 1891, the defendant entered into a written contract with the plaintiff, by which he was appointed superintendent of the defendant in fifteen counties of the State of New York. Under such written contract the defendant gave to the plaintiff the exclusive right to appoint and employ agents in his district and the plaintiff agreed that he would "in person and through agents energetically solicit and procure memberships for the bank in the district assigned to him and devote his whole business time to such work," and that he would " supervise and be responsible for all such business done in his territory and from time to time   *   *   *   visit and give his personal attention to the branches and agents in his district." The contract provides minutely as to the plaintiff's authority and duties, and then further provides: " But the Superintendent is to receive for his services an amount equal to 100 per centum of each and every membership fee coming in from his dis-

trict, through him or agents. He may, however, retain 100 per centum of the membership fee on account, for himself or for advances to agents provided the receipt hereof is acknowledged to him by the Bank, either directly or by countersigning as agents receipt as already specified and the amounts so receipted for shall be charged to his account.

" In order to maintain the business under his charge as long as he remains such Superintendent he shall receive from the ' Expense Fund ' of the Bank an amount equal to 20 per centum of amounts actually received by the Bank for the Expense Fund arising from the memberships allowed to him. If, for any reason, he ceases to be such Superintendent, he, his executors, administrators and assigns shall receive an amount equal to 15 per centum of the Expense Fund, received thereafter from business actually procured by or through him, unless his official connection with the Bank be terminated on account of dishonesty or fraud, or if he be found thereafter to have been guilty of dishonesty or fraud in the conduct of his business for the Bank, in which case he and they shall receive nothing from the Bank at any time after such termination of his office. Accounts of amounts due to the Superintendent are to be rendered to him by the Bank upon each quarter year's business, and payments of amounts so found due are to be made as soon after the end of each quarter as may be reasonably required to prepare and settle the accounts. But an approximation of amount coming to him shall be made on the first of each month and a check for the amount forwarded to him on account. If, however, he is discharged by the. Bank for any other cause than neglect of the business, dishonesty or fraud, the Bank shall pay him the full 20 per centum of the Expense Fund as if he were actually employed." The plaintiff was required from the amount received by him to pay the expenses and compensation of the agents appointed by him and also all rent and every other expense in the conduct of the business in his district.

The contract also provided: " This appointment is to continue for a period of ten years from date hereof, and for such time thereafter as the parties hereto may agree; but either party may terminate it at pleasure, at any time by giving the other party ten days' written notice personally or by mail. After such notice is

given the Superintendent shall, at once and on demand turn over his business and all property of the Bank to a properly accredited representative of the Bank. The death of the Superintendent shall immediately terminate this appointment."

By a supplementary contract executed on said twenty-fourth day of September it was provided that the plaintiff should receive in addition to the amounts stated in the original contract fifteen per cent of the amount credited to the expense fund from dues collected on memberships procured prior to the date of his appointment in the district allotted to him. The supplemental contract contained a condition as follows : " Should, however, said Rollins leave the employ of the Bank of his own accord and work for a like association within one year from date, this agreement shall be void."

On the 2d day of March, 1894, the parties made a farther contract by which it was agreed that on and after October 1, 1893, the plaintiff should be paid thirty-two and one-half per cent of the expense fund received by the bank for business obtained in the district after March 1, 1893. Out of said thirty-two and one-half per cent said contract expressly provides that the plaintiff shall pay certain percentages that had theretofore been agreed to be paid by the defendant to other persons within the district. It also provided that the plaintiff should receive seventeen and one-half per cent from the expense fund received by the defendant on certain business obtained in a prescribed part of the district prior to the time therein mentioned. The plaintiff continued in the employment of the defendant until the 10th day of February, 1899, a period of between seven and eight years. It is conceded that prior to the 10th day of February, 1899, the contracts had been faithfully performed by the parties thereto. On that day, by mutual agreement, the plaintiff surrendered and assigned to the defendant his said contracts with it, and in consideration of one dollar and of the surrender and assignment of the said contracts the defendant agreed and bound itself, its successors and assigns, " to pay to the said party of the first part the 20 per cent of the amounts hereafter collected by said party of the second part for the Expense Fund of said Bank, arising from the stock now in force, or from all of said stock continuing in force during the period of four years from the date hereof, in the district covered by said contract and supplement, dated September 24, 1891,

and to pay a proportionate part of the same to said party of the first part in weekly payments for the term of four (4) years from the date hereof, and no longer, and to make quarterly settlements with said party of the first part of any unpaid balance of said 20 per cent as aforesaid."

Since February 10, 1899, the plaintiff has not performed any service for the defendant except that from time to time he has, at the defendant's request, exerted his influence to have the old stockholders continue their payments upon the stock held by them.

The defendant performed its part of the agreement of February 10, 1899, until in the year 1901. The last payment made by the defendant to the plaintiff on account of said contracts was made January 28, 1901, which paid the plaintiff in full under the terms of said contract to October 1, 1900. The defendant refused to make any further payments to the plaintiff on account of said contract, and this action is brought to recover therefor. It is conceded that if the plaintiff is entitled to recover against the defendant in this action, the amount due and owing to him on account of said contract is $1,302.39.

On the 16th day of January, 1900, the defendant had gross assets from which an income was derived. On that day it materially changed its by-laws, by which it entirely abolished the " Expense Fund " as provided by the original articles of association, and other provision was made for the payment of the expenses of the association.

At the time the defendant's by-laws were so changed the plaintiff was not a member of the corporation. It is claimed by the defendant that, as the contracts provide that the payments to the plaintiff were to be made from the " Expense Fund," the plaintiff cannot now after the defendant has abolished the " Expense Fund " compel the payment of any sum whatever. Such voluntary change of the defendant's by-laws without the plaintiff's knowledge, consent or acquiescence cannot be considered for the purpose of destroying the provisions of a valid contract. (*Sinteff* v. *People's Building Association,* 37 App. Div. 340; *Beach* v. *Supreme Tent, K. of M.,* 177 N. Y. 100.)

The amount that the plaintiff is entitled to receive by the terms of the contracts can be easily ascertained, notwithstanding the

changes made in the by-laws, and it has been agreed upon and admitted as a part of the record by the parties hereto.   The contracts should be performed by the parties in view of the articles of association and by-laws in force at the time such contracts were severally made.

The defendant also claims that all the contracts made by the defendant with the plaintiff are unreasonable and void, and cites as authority for its contention *Beers* v. *N. Y. Life Ins. Co.* (66 Hun, 75); *Carney* v. *N. Y. Life Ins. Co.* (19 App. Div. 160; affd., 162 N. Y. 453), and *Caldwell* v. *Mutual Reserve Fund Life Association* (53 App. Div. 245).   The trial court found as a fact that each of the contracts made by the defendant with the plaintiff is unreasonable, and that the contract of February 10, 1899, was also without consideration, and dismissed the plaintiff's complaint on the merits.

We will first consider the validity of the contract of September 24, 1891, as modified by the supplemental contract and further contract of March 2, 1894.

In *Beers* v. *N. Y. Life Ins. Co.* (*supra*) it was held that a contract made with the plaintiff when he was the president of the company to the effect that he should resign his office as president and thereafter receive from the company for life a salary of $37,500 per year, in consideration of which the plaintiff agreed that " so far as strength and health permitted " he would serve the company in an advisory capacity and not become an officer or employee of any other life insurance company was unreasonable and that the officers of the defendant had no power to make such a contract.

In *Carney* v. *N. Y. Life Ins. Co.* (*supra*) it was held that a contract made with the plaintiff by the officers of the defendant by which the plaintiff was employed as a physician for life was unreasonable, and that the officers of the defendant had no power to make such contract.

In *Caldwell* v. *Mutual Reserve Fund Life Association* (*supra*) the defendant entered into a contract with the plaintiff by which it agreed that if the plaintiff would become the manager of a department of the defendant's business known as the Liverpool department, embracing part of the territory of the British islands, and would personally attend to the business of said department for a

period of not less than six months, and before leaving the same in person secure one or more competent persons to take charge of the business of that department, that the defendant would pay to the plaintiff upon all business done in or pertaining to said department at any time during the period of ten years from his taking charge of said business and department, all of the admission fees paid by policyholders or members of defendant insuring during such period of ten years, and also fifty per cent of the dues for expenses actually paid during the first year of insurance under all policies of insurance issued in said department by the defendant during said ten years, and also fifty per cent of all dues for expenses actually paid at any and all times after said first year upon such policies so long as the same should be paid to the defendant, the defendant agreeing to defray the expenses of the business of said department. The plaintiff accepted said employment and remained in personal charge of said department for more than six months, and then left the same in charge of a competent person. Such contract was subsequently modified, increasing the amount to be paid to the plaintiff. In an action brought against the defendant after more than ten years had expired from the time when said contract was originally made with the plaintiff, and in which action the plaintiff demanded judgment for $150,000, it was held that the contract was unreasonable and that neither the officers of the association nor the board of directors had power to make such a contract.

The facts in the *Beers* case and in the *Carney* case are entirely different from the facts under consideration. The contracts under consideration in such cases were unreasonable. By such cases it is established that an unconditional employment by corporate officers of a person for life contradicts and is repugnant to the express authority of such officers to appoint, remove and fix the compensation of employees, and also that a board of directors elected for a limited time should not be allowed to make contracts unreasonably interfering with the powers of future boards of directors, upon whom must rest the responsibility of the conduct and management of the business of the corporation. The contracts in such cases were held to unreasonably hamper future corporate officers. We do not understand that the court intended to hold that all reasonable contracts, extending beyond the term of the corporate officers

or board entering into the contract on behalf of the corporation, are void. Such a rule, especially where the term of all the board of directors expires at the same time, would be subversive of the best interests of the corporation.

In the *Caldwell* case, as we have stated, the plaintiff, in consideration of a minimum personal service of six months, was to receive all of the admission fees and a large part of the dues for expenses, not only from policyholders obtained during the six months of his personal employment, but also from all business obtained in the district by the defendant for ten years. The court say : "We do not think its board of directors, much less its executive committee, could enter into a contract with a person by which it agreed to pay him a compensation extending beyond the time when he rendered services, the extent of which might go beyond his life, and the amount of which could by no possibility be known. If the corporation had power to thus deal with the plaintiff, if it could for six months' services rendered by him agree to pay him a certain amount of the premiums received, not for ten years, but so long as persons insured within that time should continue to pay premiums, then it could make a contract with other of its employees by which the entire income derived from policyholders would be exhausted and thereby completely disable itself from performing its obligations. Manifestly this could not be done. It would not only defeat the object of the statute which committed the management of the business and affairs of the corporation to a board of directors, but would be a fraud upon policyholders which the law does not and will not sanction."

The facts in the *Caldwell* case are also entirely different from the facts in the case under consideration. In this case there is a definite fixed period after which all payments to the plaintiff are to cease, and during such period the payments to the plaintiff are limited to a specified percentage of the expense fund so far as it is derived from stockholders in the district who had subscribed for their stock while the plaintiff was personally in charge thereof. The maximum amount payable to the plaintiff after his personal services shall cease, if at all, is, therefore, subject to computation, and the fact that the amount thereof may be materially reduced by the withdrawal of stockholders cannot injuriously affect the defend-

ant so far as the contract with the plaintiff is concerned. It appears from the record that the contracts with the plaintiff are usual and customary contracts for insurance and co-operative corporations to make with their employees. The circumstances and general condition of the business of the defendant at the time the first contract was made with the plaintiff should be borne in mind in considering the reasonableness of such contract. When the contract was made with the plaintiff the defendant was wholly without assets and wholly without income except such as was derived from payments by members on account of stock subscribed by them. The plaintiff was obliged to build up a new business for a new corporation. The amount of business that the defendant might obtain in the district depended upon the plaintiff's personal exertion, and although the business required the expenditure of money and consumed all of plaintiff's time, his compensation was necessarily small during the first part of the term of his employment. If plaintiff was successful in procuring business for the defendant his compensation would materially and continuously increase throughout the term of the employment. It is reasonably certain that a competent person could not be induced to accept such an employment for an uncertain period of time without some agreement for special compensation if his services were discontinued within a specified period. A contract with an employee to continue for a reasonable length of time, especially if the term of employment would expire before the termination of the term of office of the members of the board of directors representing the defendant, would be within the power of the defendant to make.

The contract made by the plaintiff, although for ten years, was subject to cancellation on ten days' notice by either party. It cannot, therefore, be said to have been an unreasonable contract, so far as the term of service is concerned.

The record does not disclose any claim that the amount agreed to be paid to the defendant under the contracts, including the amount payable to him after his personal services for the defendant had ceased, was in excess of the value of the services performed, or that the plaintiff did not fully and faithfully carry out his contracts and earn the amount that by such contracts the defendant agreed to pay for his services. Experience seems to have shown that it is neces-

sary, or at least advisable, to make the compensation of agents, solicitors and superintendents of corporations similar to the defendant dependent upon the work performed by them, and if the contract is reasonable in itself, we cannot see any reason for its condemnation if it provides a reasonable amount to be paid for a definite time on the business actually obtained by the employee, even after the employment has ceased.   Where contracts for such employment are for a limited period of time or subject to cancellation, a provision that such employee shall be paid a percentage on the business obtained by him for a reasonable time after his personal service to the company has ceased, does not seem to be unreasonable or unwise, from the standpoint of the corporation, and such contracts may be necessary as a proper inducement for special activity on behalf of such corporation.

The contracts now under consideration should not be held to be unreasonable, as a matter of fact, unless the condemnation of such contracts is to be so sweeping as to prohibit all contracts where the compensation, based upon the business obtained by an employee during the term of his employment, is extended and made payable for a definite period beyond the time when the employment terminates.   The findings that the plaintiff's contracts of employment are unreasonable are not sustained by the evidence in this case.

That a corporation has a right to pay employees for services by a percentage upon business obtained, including a percentage on the renewals of such business, even after the term of service has expired, is recognized in *Hercules Mutual Life Assurance Society* v. *Brinker* (77 N. Y. 435); *Hepburn* v. *Montgomery* (5 Civ. Proc. Rep. 244; modified without affecting the principle stated in 97 N. Y. 617); *Hall* v. *Brooklyn L. Ins. Co.* (120 id. 294), and other cases.

We now come to a consideration of the contract of February 10, 1899.   At the time said contract was made, assuming that the contracts theretofore made with the plaintiff are valid and binding, the plaintiff had a valuable interest in such contracts to the extent of the compensation to be paid to him after his personal services for the defendant had ceased.

For the surrender of such valuable interest the defendant joined with the plaintiff in the agreement of February 10, 1899.

It does not appear that the defendant, by such agreement, promised to pay the plaintiff more than the value of such interest.

The judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

All concurred.

Judgment reversed and new trial granted, with costs to appellant to abide event.

---

NOTE.— The rest of the cases of this term will be found in the next volume, 99 App. Div.— REP.