(No. 6128.   February 27, 1935.)

E. W. FISHER, Respondent, v. INTERMOUNTAIN BUILD-
ING & LOAN ASSOCIATION, Appellant.

[42 Pac. (2d) 50.]

Wm. H. Langroise and Sam S. Griffin, for Appellant.

W. B. Davidson and Barber & Barber, for Respondent.

GIVENS, C. J.—May 25, 1921, respondent received from appellant corporation this stock certificate:

"THIS IS TO CERTIFY, that—E. W. FISHER—is the owner of—TWENTY—shares of Investors Guaranteed Divi-

328

dend Stock of the INTERMOUNTAIN BUILDING & LOAN ASSOCIATION, a Utah Corporation, of the matured par value of One Hundred Dollars ($100.) per share, transferrable only upon the books of the association by the holder hereof in person or by attorney, upon the surrender of this certificate properly indorsed; that there was paid at the time this certificate was issued the sum of Twenty and no/100— Dollars ($20.00) and that the sum of Ten and no/100— Dollars ($10.00) is to be paid on the first day of each and every month after date hereof until such payments, together with interest earned and dividends declared, shall equal One Hundred Dollars ($100) per share. Eight per cent (8 per cent) interest, compounded semi-annually shall be credited to the book value hereof. Additional earnings of the association shall be declared as dividends and credited to this stock as provided by the articles of incorporation, by the by-laws of the association and pursuant to the acts of the board of directors. The Association hereby promises to pay, in the manner provided by its Articles of Incorporation and By-Laws, to the registered owner hereof, at maturity, upon presentation and surrender of this certificate, at its offices in Salt Lake City, Utah, the sum of Two Thousand and no/100 Dollars ($2,000).

"This certificate is subject to the provisions of the Articles of Incorporation and By-Laws of the Association and the privileges, terms and conditions on the back hereof, which are made a part hereof as fully as if set forth on the face of this certificate.

"IN WITNESS WHEREOF, The Intermountain Building & Loan Association has caused this certificate to be executed in its corporate name and its corporate seal to be hereto affixed at Salt Lake City, Utah, this 25th day of May, 1921.

"INTERMOUNTAIN BUILDING AND LOAN ASSOCIATION.
."By DANIEL ALEXANDER,
"Vice-President."

and in accordance therewith paid $20 at the date of issuance and $10 per month to April, 1932, whereupon respondent requested payment of the claimed full value of the certificate, $2,000.19, as matured January, 1932. Appellant refused payment on the basis demanded, hence this suit resulting in a judgment in favor of respondent for $2,030 and interest at 8 per cent from May 4, 1932.

Appellant's answer contained the original articles of incorporation, by-laws, pertinent building and loan association Utah statutes (its home state), and amendments thereof, asserting therefrom that respondent's request was premature and that he was not guaranteed 8 per cent interest compounded semi-annually on his progressive investment but only entitled to share in the profits, bear his share of the losses and was subject to a membership fee, thus eliminating distinctions between the different classes of stock hereafter enumerated in the articles and by-laws. The material portions of the effective Compiled Laws of Utah, 1917, Title 19, Chapter 9, follows:

"§ 1100. (392) INCORPORATION. APPROVAL OF ARTICLES. Building and loan associations organized for the purpose of raising a fund by the collection of dues or stated payments from its members, to be loaned among its members, may be incorporated under the provisions of chap. 1 of this title, respecting corporations for pecuniary profit; . . . . "

"§ 1102. (394) POWERS. Any such corporation shall have power, subject to the terms and conditions contained in the articles of incorporation and by-laws, to issue stock to its members; to assess and collect from its members reasonable membership fees, dues, premiums and fines; to permit its members to withdraw any or all of their stock deposits upon equitable terms; . . . . ,"

And the articles of incorporation then in force:

## "ARTICLE V.

"Section 1. The purpose for which said Association is formed and the character of its business shall be to provide

a loan and investment fund by sale of stocks, bonds, certificates, and other securities, the same to be paid for in single payments or by installments; to make loans to its members on a monthly payment plan of principal and interest; to borrow and receive money for loan purposes and handle contracts, stocks, bonds and other securities for same; or others and to sell, loan, mortgage, and otherwise contract with reference thereto. . . . .

## "ARTICLE VI.

"The authorized capital of this Association shall be $1,000,000, divided into two classes of stock, 100,000 shares of the Guarantee Stock of the par value of $1.00 per share, payable by the subscriber as follows, to-wit: 5¢ per share on subscription and the balance on call of the Board of Directors, which said call shall not at any one time exceed 2¢ per share, nor can a call be made under ninety day periods. When such payments and accumulated earnings thereon shall equal $1.00 per share, said stock shall stand as a permanent stock which shall be held to protect the Association and guarantee all stocks, bonds, securities, and creditors against loss. Nine thousand shares of Investors Guaranteed Dividend Stock of the maturity value of $100 per share, payable by the subscriber in one installment or on as suitable installment plans as the Directors of the Association may by resolution enact. The Investor's Guaranteed Dividend Stock may be withdrawn by the owner thereof at any time after thirty six months after purchase thereof, provided, however, that all payments then due shall have been regularly paid thereon after giving thirty days' written notice to the company of intention to withdraw. The entire book value of said stock shall be paid the regular holder of said stock from the guarantee fund in the way and manner as provided by law."

## "ARTICLE VIII.

"Section 1. . . . .

"Section 2. . . . . Each holder of stock shall be entitled to one vote for each share of stock owned by him as shown

by the books of the Association thirty days prior to the said stockholders' meeting, which he may cast by person or by written proxy. . . . . ''

## "ARTICLE IX.

"There shall be two funds maintained by the Association. First, the Guarantee Fund, and second, a General Fund. The Guarantee Fund shall consist of all moneys received on stock payments of all classes of stock and all profits earned except the moneys paid in to the General Fund as hereafter provided. This fund shall guarantee and pay the Investor's Guaranteed Dividend Stock 8% per annum interest upon the total book value or the amount standing to the credit of such stock on the books of the company, which amount or book value shall be all moneys paid on said Investor's Guaranteed Dividend Stock less all moneys paid thereon into the General Fund of the Association as hereinafter provided as long as the maximum rate of interest for the State of Utah shall be 12% per annum. Should the said maximum rate of interest be reduced, then the said guarantee after said deduction of 8% per annum on said Investor's Guaranteed Dividend Stock shall be reduced 1% for each 1% of said maximum rate of interest for the State of Utah hereafter reduced. The said Investor's Guaranteed Dividend Stock shall, in addition to receiving the interest as aforesaid, share in the earnings of the Association share for share with the Guarantee Stock after said Guarantee Stock has received 8% per annum on the par value thereof. All dividends declared and all interest paid shall be charged to the said guarantee fund. All said interest and dividends and payments of matured stock shall be made and paid out of said guarantee fund in the way, manner, and order as provided by law.

"The general fund of the Association shall consist of the following: 1. All amounts charged for making loans of the Association. 2. All loadings, membership fees, fines, penalties, etc., which shall not total more than 2% per annum on the par value of all stock of the Association.

3. Not more than an additional 10% of the par value of any subscribed stock of the Association. All expenses, losses, and commissions shall be charged to the General Fund."

The plain, clear and unambiguous terms of the stock subscription certificate are that respondent was to pay "until such payments" (that is, $10 per month) "together with interest earned and dividends declared shall equal $100 per share." The only interest referred to is in the following sentence, equally clear and explicit:

" . . . . Eight per cent (8 per cent) interest, compounded semi-annually, shall be credited to the book value hereof. . . . . "

The only dividends referred to are in the next sentence, likewise lucid and definite:

" . . . . Additional earnings of the association shall be declared as dividends and credited to this stock as provided by the articles of incorporation, by the by-laws of the association and pursuant to the acts of the board of directors. . . . . "

Thus the first sentence in the certificate provides what respondent was to pay; the next two what appellant was to contribute towards repayment, and by way of recapitulation the next sentence provides that at maturity, occurring when respondent's payments plus 8 per cent interest plus dividends hereafter explained equaled $100 per share, and since there are 20 shares, $2,000 would be paid respondent.

The sentence with regard to dividends and the recapitulatory sentence refer to the articles of incorporation and by-laws. Turning to the germane provisions thereof, by section 1, article V, appellant may borrow money. Article VI provides for two classes of stock, the Guarantee Stock and Investors' *Guaranteed* Dividend Stock, respondent's class. The Guarantee Stock was not to be withdrawn but held to guarantee, among other obligations, payment of the *Guaranteed* Stock when matured. Two funds were provided for by article IX, the Guarantee Fund and the General Fund. The latter to

" . . . . guarantee and pay the Investor's *Guaranteed* Dividend Stock 8% per annum interest upon the total book value or the amount standing to the credit of such stock on the books of the company, which amount or book value shall be all moneys paid on said Investors' Guaranteed Dividend Stock less all moneys paid thereon into the General Fund of the Association as hereinafter provided as long as the maximum rate of interest for the State of Utah shall be 12% per annum. Should the said maximum rate of interest be reduced, then the said guarantee after said deduction of 8% per annum on said Investors' Guaranteed Dividend Stock shall be reduced 1% for each 1% of said maximum rate of interest for the State of Utah hereafter reduced. The said Investors' Guaranteed Dividend Stock shall, in addition to receiving the interest as aforesaid, share in the earnings of the association share for share with the Guarantee Stock after said Guarantee Stock has received 8% per annum on the par value thereof. All dividends declared and all interest paid shall be charged to the said guarantee fund. All said interest and dividends and payments of matured stock shall be made and paid out of said guarantee fund in the way, manner, and order as provided by law." (Italics ours.)

While such section thus states that the book value or amount standing to the credit of the Investors' Guaranteed Dividend Stock shall be all moneys paid thereon *less all money paid thereon* into the General Fund, nowhere in the articles or the by-laws is there provision as to what part of the money paid on said Investors' Guaranteed Dividend Stock shall be paid into the General Fund, and while it is later provided in the same article that the General Fund shall include all of the "loadings, membership fees, fines, penalties, etc.," which shall not total more than 2 per cent per annum on the par value of all stock, etc., there is no provision in either the articles of incorporation or by-laws that the Investors' Guaranteed Dividend Stock shall pay or be charged with any "loadings, membership fees, fines, pen-

alties," commissions or losses, or otherwise, and it is further specifically provided, as noted above, that all expenses, losses and commissions shall be charged to the General Fund. Thus, while provision might have been made for some payment to the General Fund or the Guarantee Fund of part of the payments made by a Guaranteed Dividend Stock investor, none was so made for any purpose. Nor did article X impose a membership fee on the purchase of Investors' Guaranteed Dividend Stock, and nothing in the above statutes in any way prohibited appellant from making the two classifications of stock and preferring the one. Therefore construing the stock certificate, articles of incorporation, by-laws and statutes together, the conclusion is inescapable that the Investors' Guaranteed Dividend Stock was put in a class by itself and that these stockholders were to receive 8 per cent compounded semi-annually credited to the book value thereof, and also a proportionate share in additional earnings of the association to be declared as dividends, evidently so far as the record discloses nonexistent, hence demanding no further attention. The only diminution of the 8 per cent interest provided for in the articles or by-laws was contingent on the state's reduction of the legal rate of interest below 12 per cent, not alleged by appellant to have occurred.

Upon appellant's theory, the stock would have matured some time unless dissipated by losses; the only difference in its view then would be added uncertainty of finality, or perhaps infinity of maturity if the expenses of the organization were kept high enough. Yet it is quite apparent that the expressed intent and purpose was that the Investor's Guaranteed Dividend Stock should mature and that was guaranteed by the other stock and the then Guarantee and General Funds, so appellant's straw man of asserted illegally arbitrarily fixed date of maturity falls of its own weight.

Appellant next urges that so construed the contract destroys the mutuality and parity between stockholders,

asserted essential ingredients of building and loan association structure, relying upon authorities to the effect that no preference may be made between stockholders in such corporations. The authorities not only do not sustain this contention where, as here, the statutes in force at the time did not prohibit such classifications and specifically authorized building and loan associations to borrow money and the articles of incorporation and by-laws specifically and in detail set forth and provide for what in effect amounts to preferred stock, designed for the purpose of securing money in a method other than the one whereby it was acquired from and through the other class of stockholders, but directly sanction such classifications.

In *Hogsett v. Aetna Building & Loan Assn.*, 78 Kan. 71, 96 Pac. 52, the plan was almost identical with that herein and approved over objections similar to those urged herein, and this might well be termed a ''white horse case.'' The same conclusions are upheld in *Wilson v. Parvin*, 119 Fed. 652; *Central Building, Loan & Savings Co. v. Bowland*, 216 Fed. 526; *In re Hicks-Fuller Co.*, 9 Fed. (2d) 492; *Cottingham v. Equitable Building & Loan Assn.*, 114 Ga. 940, 41 S. E. 72; *Coltrane v. Blake*, 113 Fed. 785, 787; *Hammerquist v. Pioneer Savings & Loan Co.*, 15 S. D. 70, 87 N. W. 524; *Fourth Nat. Bank v. Albaugh*, 188 U. S. 734, 23 Sup. Ct. 450, 47 L. ed. 673; *Vought v. Eastern Building & Loan Assn.*, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. 761; *People v. New York Nat. Building & Loan Assn.*, 95 App. Div. 243, 88 N. Y. Supp. 850.

Authorities apparently holding to the contrary are to be distinguished because they considered totally different contracts or statutes.

If under the guise of a mutual scheme which in operation and practice is not mutual, investors or borrowers are discriminated against contrary to their contracts, or if on the other hand, under the guise of preference, investors are lured into buying stock and then in practice and operation the organization attempts to impose a share

of loss not specified in the contract, the courts are under equal obligation to afford protection. The case herein falls within the latter category. (*Rooney v. Southern Building & Loan Assn.*, 119 Ga. 941, 47 S. E. 345.)

The last point urged by appellant is that after respondent purchased his stock the statutes of Utah and the articles of incorporation and by-laws were amended so as to remove the preference as to respondent's stock (without conceding that there was any such original preference) and placed respondent's stock in the same class with the other stock entitled only to share in the net profits, based upon the provision in the subscription that the

" . . . . certificate is subject to the provisions of the Articles of Incorporation and By-Laws of the Association and the privileges, terms and conditions on the back hereof, which are made part hereof as fully as if set forth on the face of this certificate. . . . . "

and the provision in the articles of incorporation and the by-laws that they could be amended from time to time and that respondent by reason of his stock had a vote for every share of stock, although the stipulation of facts shows that he never had any actual notice of or attended any meeting where these changes were made, although all notices were properly made in accordance with the statutory requirements. It is to be noticed that the specific provision in the stock certificate with regard to the certificate being subject to the provisions of the articles of incorporation and by-laws referred to those articles of incorporation and by-laws made by reference a part of the certificate, hence must have been those then in existence, and did not specify that the certificate was subject to any by-laws or changes thereafter to be adopted, or any similar language.

Under these circumstances the amendments, since they affect the substance of respondent's contract, not the remedy only, may not avail to impair his contract. (*Field v. Eastern Building & Loan Assn.*, 117 Iowa, 185, 90 N. W. 717; *Savage v. People's Building, Loan & Savings Assn.*, 45

337

W. Va. 275, 31 S. E. 991; *Fisher v. Patton,* 134 Mo. 32, 34
S. W. 1096; *Interstate Building & Loan Assn. v. Wooten,*
113 Ga. 247, 38 S. E. 738; *Sinteff v. People's Building, Loan
& Savings Assn.,* 37 App. Div. 340, 57 N. Y. Supp. 611;
*Rollins v. Co-operative Building Bank,* 98 App. Div. 606, 90
N. Y. Supp. 631; *Holyoke Building & Loan Assn. v. Lewis,*
1 Colo. App. 127, 27 Pac. 872; *Rogers v. Ogden Building &
Savings Assn.,* 30 Utah, 188, 83 Pac. 754; *Intiso v. State
(Metropolitan Savings & Loan Assn., Prosecutor),* 68 N. J. L.
588, 53 Atl. 206.)

Respondent was entitled to payment in full of his
claim as matured and is not governed by the provisions
relative to a withdrawal. (9 C. J. 938; *Rogers v. Ogden
Building & Savings Assn., supra; Wallis v. Eagle Savings
& Loan Co.,* 180 App. Div. 719, 168 N. Y. Supp. 513.)

Judgment affirmed. Costs to respondent.

Budge and Holden, JJ., and Sutphen and Barclay, D. JJ.,
concur.